Michael JACKSON, et al., Plaintiffs,

v.

CULINARY SCHOOL OF
WASHINGTON, et al.,
Defendants.

Civ. A. No. 91–782 (CRR).

United States District Court,
District of Columbia.

March 26, 1992.

**1238**

Paul Fiscella, Northern Virginia Legal Services with whom Clare L. McCulla, Alexandria, Va., was on the brief, for plaintiffs.

Mark E. Shure, McDermott, Will & Emery with whom Amy E. Hancock, Chicago, Ill., was on the brief, for defendant Higher Educ. Assistance Foundation.

Virginia W. Powell, Hunton & Williams with whom Mark B. Bierbower, Richmond, Va., was on the brief, for defendant Crestar Bank.

Laurie J. Pangle, Toledo, Ohio, Fifth Third Bank of Toledo, N.A., for defendant Fifth Third Bank of Toledo, N.A.

Richard D. George, Great Lakes Higher Educ. Ass'n, Madison, Wis., with whom Michael R. Hatcher, Israel & Raley, Chartered, Washington, D.C., and David J. Hanson and Ann Ustad Smith, Michael, Best & Friedrich, Madison, Wis., were on the brief, for defendant Great Lakes Higher Educ. Ass'n.

Saul L. Moskowitz, Clohan & Dean, Washington, D.C., and W. Scott Davis, Bruckner, O'Gara, Keating, Sievers & Hendry, Lincoln, Neb., with whom Paul R. Dean and Douglas K. Spaulding, Reed, Smith, Shaw & McClay and John E. Dean, Clohan & Dean, Washington, D.C., were on the brief, for defendants Nebraska Student Loan Program and Texas Guaranteed Student Loan Program.

Leslie H. Wiesenfelder, Dow, Lohnes & Albertson, Washington, D.C., for defendant Ohio Student Loan Com'n.

Richard L. Brusca, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendant Student Loan Marketing Ass'n.

Fred E. Haynes, Asst. U.S. Atty., Washington, D.C., with whom were Jay B. Stephens, U.S. Atty., John D. Bates, Asst. U.S. Atty., and Fred Marinucci, of Office of Gen. Counsel, Dept. of Educ., on the brief, for defendant Secretary of Educ.

Richard C. Kast, Asst. Atty. Gen., with whom was Mary Sue Terry, Atty. Gen., Richmond, Va., on the brief, for defendant Virginia State Educ. Assistance Authority.

## TABLE OF CONTENTS

I. Introduction and Analysis ........................................ 1239–1240

II. The Secretary's Motion to Dismiss Shall be Granted in Part and Denied in Part

 A. Given the Secretary's Own Policy Statements, Plaintiffs May Defend Against Collection by the Secretary on the Basis of an Alleged Origination Relationship Between the Lenders and CSW ....... 1241

 B. Plaintiffs Have Adequately Alleged an Estoppel Against the Secretary Due to the Alleged Agency Relationship Between the Secretary and CSW ......................................... 1241–1244

 C. The Higher Education Act Does Not Wholly Preempt State Law Governing the Enforceability of Student Loan Promissory Notes 1244–1246

 1. Plaintiffs Have Stated a Cause of Action Under D.C.Code § 28–3809(a)(3) and the Secretary's Motion to Dismiss This Claim Shall Be Denied ..................................... 1246–1248

 2. Although the FTC Holder Rule Does Not Provide Plaintiffs Relief as a Matter of Federal Law, Plaintiffs Have Stated a Claim for Failure to Include the Notice of Defenses Clause Pursuant to D.C.Code § 28–3904 and the Motions to Dismiss Shall Be Denied ..................................... 1248–1253

 3. Plaintiffs Have Failed to State a Claim Upon Which Relief Can be Granted With Respect to D.C.Code § 28–3808 and the Defendants' Motions to Dismiss Shall Be Granted ........ 1253–1255

 4. Plaintiffs Have Failed to State a Claim Upon Which Relief Can be Granted Under D.C.Code § 28–3807 and the Defendants' Motions to Dismiss these Claims Shall Be Granted ........ 1255

5. Plaintiffs Have Failed to State a Cause of Action Pursuant to the D.C. Licensing Regulations for Proprietary Schools and the Defendants' Motions to Dismiss these Claims Shall Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1255–1256

D. Because Plaintiffs Do Not Have a Private Cause of Action Under the Higher Education Act as a Matter of Law, These Claims Against the Secretary Shall Be Dismissed . . . . . . . . . . . . . . . . . . . 1256–1259

E. Plaintiffs Cannot Assert Claims Against the Secretary on the Basis of an Ultimate Lender Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1259

III. The Guaranty Agencies' Motions to Dismiss Shall be Granted in Part and Denied in Part

A. Plaintiffs Do Not Have a Private Right of Action Against the Guaranty Agencies Under the HEA . . . . . . . . . . . . . . . . . . . . . . . . . 1260

B. Because Plaintiffs Cannot Assert Claims Against the Guaranty Agencies on the Basis of an Origination Relationship, the Court Shall Dismiss these Counts of the Complaint with Respect to the Guaranty Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1260–1263

IV. The Lenders' Motions to Dismiss Shall Be Granted in Part and Denied in Part . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1263–1264

V. Pursuant to Fed.R.Civ.P. 12(b)(6), the Court Shall Dismiss the Complaint Against Sallie Mae, Without Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . 1264–1265

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1265–1266

## OPINION

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION AND ANALYSIS

This is a putative class action[1] in which Plaintiffs, former students at the now-defunct Culinary School of Washington (hereinafter, "CSW" or "the school"), seek declaratory and injunctive relief against the Secretary of Education ("Secretary"), Crestar Bank, First National Bank of Toledo, certain State and private Guaranty Agencies[2] and the Student Loan Marketing Association ("Sallie Mae").[3] Plaintiffs contend that the school not only promised educational training in the culinary arts but employment opportunities thereafter for its students. According to the Plaintiffs, the school fraudulently misrepresented its facilities and the strength of its educational program, and thereby fraudulently induced the students to take out GSLs.[4] Complaint

1. By agreement of the parties, Plaintiffs' request for certification of a class, pursuant to Fed. R.Civ.P. 23, shall be held in abeyance until the Court resolves the Defendants' various Motions to Dismiss, or in the alternative, for Summary Judgment. *See* Order, *Jackson v. Culinary School of Washington,* Civ. 91–782, (D.D.C., August 20, 1991).

2. A Guaranty Agency is any State or nonprofit private institution or organization with which the Secretary has an reinsurance agreement. *See* 20 U.S.C. §§ 1085(j), 1078(b). Those Guaranty Agencies named as Defendants in the Complaint are: the Higher Education Assistance Foundation, the Great Lakes Higher Education Assistance Association, Nebraska Student Loan Program, the Texas Student Loan Program, and the Ohio Student Loan Commission.

3. Plaintiffs also seek declaratory, injunctive and monetary relief from the school and from Bar-

kev Kibarian, Chairman of the school's Board of Directors, for, *inter alia,* breach of contract, fraudulent misrepresentation, and engaging in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961, *et seq. See* Complaint, Counts IV and V. These claims are not now before the Court.

4. CSW began participating in the student loan program in 1982. During the 1982–1990 period, CSW students received $18.8 million in student loans. Approximately $6.6 million of this total amount was disbursed in 1989. *See* Secretary's Motion to Dismiss at 3–4; Complaint at 42, ¶ 148. The putative Plaintiff class in this lawsuit attended CSW between May 1, 1985 and June, 1990. *See* Complaint at 8, ¶ 1. The school ceased operations in June of 1990 after an unsuccessful attempt to reorganize in Chapter 11 bankruptcy. *See* Complaint at 12, ¶ 2.

at 25, ¶ 59. Plaintiffs are now in default on these student loans. In this action, Plaintiffs seek declaratory and injunctive relief such that their student loans would be null and void and subject to various federal and state law claims and defenses. At bottom, the Plaintiffs contend that the Court should prevent the Secretary, the Guaranty Agencies, the lenders and Sallie Mae from collecting on these loans because the GSLs were extended to the students herein despite the fact that "the Secretary, the guaranty agencies and the banks all knew or had reason to know that CSW was ineligible for the GSL program." Complaint at 43, ¶ 158.

The Court has been inundated with papers by all parties. In view of the importance and complexity of these issues, this is not surprising. The Plaintiffs' 102–page Complaint asserts numerous causes of action and is hardly the model of clarity. The Secretary of Education, the Guaranty Agencies, the lenders and Sallie Mae have predictably filed voluminous Motions to Dismiss the various and sundry claims. Rule 12 of the Federal Rules of Civil Procedure "streamlines litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). In particular, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Id.* However, in determining whether the Plaintiffs have failed to state a claim as a matter of law, the Court must construe the Complaint liberally, granting the Plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979) (quoting *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969)).

Prior to evaluating the Defendants' respective Motions to Dismiss, it is important to outline the basic structure of the GSL program in which the Plaintiffs participated. A student meeting the prescribed needs test may obtain a GSL. *See* 20 U.S.C. §§ 1087kk–1087uu (1986). However, GSLs are available only if the student attends an "eligible institution" as defined by 20 U.S.C. §§ 1085(a)–(c). CSW was deemed an eligible institution and entered into a program participation agreement with the Secretary. Pursuant to the GSL program, Plaintiffs executed promissory notes with private lenders, such as the Defendants Crestar and First National Bank of Toledo. Non-profit Guaranty Agencies and the Secretary subsidized the program by guaranteeing payment to the private lenders in the event of a student's default on the loan. *See* 20 U.S.C. §§ 1078, 1087. In the event of default, the private lender may assign the loan to the Guaranty Agency and the Guaranty Agency could begin collection efforts against the student. Pursuant to the Secretary of Education's contractual reinsurance agreements with the Guaranty Agencies, the Secretary could receive an assignment of the loan and could then undertake collection efforts upon reimbursing the Guaranty Agencies for any losses incurred on the defaulted loan. *See* 20 U.S.C. § 1078; 34 C.F.R. § 682.410(b)(4). In this action, the Plaintiffs seek to halt the collection efforts of the lenders, the Guaranty Agencies and the Secretary under a variety of theories. In evaluating the Defendants' respective Motions to Dismiss, the Court must determine whether the Plaintiffs have stated a basis upon which to defend against the collection of their student loans.

## II. THE SECRETARY OF EDUCATION'S MOTION TO DISMISS SHALL GRANTED IN PART AND DENIED IN PART

Upon consideration of the claims herein with respect to the Defendant Secretary of Education, the Court finds that the Plaintiffs have stated causes of action against the Secretary with respect to the alleged origination relationship between CSW and the lenders; D.C.Code § 28–3809(a)(3) (1981); D.C.Code § 28–3904 (1981); and on the basis of an estoppel due to the alleged agency relationship between the school and the Secretary. Accordingly, the Secretary's Motion to Dismiss shall be denied with respect to these claims. However, the Secretary's Motion to Dismiss shall be

granted with respect to all claims under the Higher Education Act, 20 U.S.C. § 1070 *et seq.;* D.C.Code § 28–3808 (1981); D.C.Code § 28–3807 (1981); D.C.Mun.Regs. tit. 16, §§ 1212.1, 1212.2; the "ultimate lender theory"; and Plaintiffs' estoppel claims with respect to the actions of the Secretary himself and the Guaranty Agencies.

A. *Given the Secretary's Own Policy Statements, Plaintiffs May Defend Against the Secretary's Collection Efforts When There Exists an Origination Relationship Between the Lender and the School.*

■ Plaintiffs seek to assert claims arising out of CSW's alleged wrongdoing against the Secretary on the basis of an alleged "origination" relationship between the lenders and CSW as defined by federal law.[5] Complaint at 72, ¶ 266(a); *id.* at ¶ 174 (alleging the existence of an origination relationship between CSW and the banks). In various letters and policy statements, the Secretary has promised to abstain from collection of those defaulted student loans arising from an origination relationship. *See* Complaint at 30, ¶ 81. The Secretary's position is evidenced in a July 21, 1988 letter from Dewey L. Newman, Deputy Assistant Secretary for Student Financial Assistance at the DOE, to the Commissioner of Education at the Texas Education Agency:

> If a loan is not legally enforceable, it is not insurable by the Department, and the Department would not encourage or require a lender or guaranty agency to attempt to collect such a loan. As a legal matter, however, a student who borrows under the GSL program from a third party lender remains responsible for repaying the loan even if the school closes, unless a relationship exists between the lender and the school that would make the school's failure to render educational services a defense to repayment of the loan to the lender.... The agency has termed such an agency rela-

tionship an "origination relationship." 34 C.F.R. § 682.200.

Ex. 2, attached to Complaint. The Secretary acknowledges the existence of this long-standing policy in his Motion to Dismiss. *See* Secretary's Motion to Dismiss at 14. Given that the Secretary has unequivocally expressed an intention to be bound by these statements, the students may assert school-based claims arising out of an origination relationship against the Secretary. *See Tipton v. Secretary of Education,* 768 F.Supp. 540, 570 (S.D.W.Va., 1991). *Cf. Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974) (agency obligated to adhere to its own internal guidelines). *Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528, 538 (D.C.Cir.1988).

B. *Plaintiffs Have Adequately Alleged a Basis for an Estoppel Against the Secretary Due to the Alleged Agency Relationship Between the Secretary and CSW.*

■ According to the Plaintiffs, the Secretary "as the principal in all the transactions with the named Plaintiffs and members of the class, is responsible for the acts of its agents, the Guaranty Agencies and CSW." Complaint at 76, ¶ 270. Plaintiffs disavow any attempt to impose liability upon the Secretary in tort. *See* Pl.Opp. at 70. However, Plaintiffs apparently proceed under a contract theory of fraudulent inducement or under principles of equitable estoppel. *Id.* The Secretary moves to dismiss these claims, arguing that the Plaintiffs cannot, as a matter of law, posit the existence of an agency relationship between the Secretary and CSW and the Guaranty Agencies. *See* Secretary's Reply at 24. Upon consideration of the arguments, the Court must deny the Secretary's Motion to Dismiss the Plaintiffs' estoppel claims arising from the alleged agency relationship between CSW and the Secretary. However, the Court shall grant the Secretary's Motion with respect to the remaining

---

5. An "origination" relationship is "a special relationship between a school and a lender, in which the lender delegates to the school, or to an entity or individual affiliated with the school, substantial functions or responsibilities normally performed by lenders before making loans." 34 C.F.R. § 682.200.

estoppel claims and shall dismiss the estoppel claims with respect to the alleged wrongdoing of the Secretary himself and the Guaranty Agencies.

The Secretary first contends that the agency issue is of limited importance because the Secretary has already agreed to forbear from collecting loans determined to be legally unenforceable under applicable state law. In the Secretary's view, the agency argument would address "only ... those loans held to be legally enforceable." Secretary's Reply at 24, n. 27. The Secretary's attempt to mitigate the impact of the agency argument fails. If CSW or the Guaranty Agencies are, in fact, agents of the Secretary, then the Secretary, as a principal, may be charged with the alleged misrepresentations of these agents as a matter of law. *See, e.g.,* 3 C.J.S. Agency § 401, at 238–240 (1973). Thus, the existence of an agency relationship with the Secretary may influence the Secretary's ability to enforce the underlying loan contracts because the agent's misrepresentations may well spawn a defense to the Secretary's collection efforts.[6] *Id.*

The Secretary vociferously challenges Plaintiffs' attempt to define CSW or the Guaranty Agencies as agents of the Secretary. In his reply, the Secretary abandoned the analogy to the Federal Tort Claims Act and instead sought to show that the Plaintiffs could not, as a matter of law, make out an agency relationship. According to the Secretary, Plaintiffs failed to "identify a task or function that the Department as a principal performs, and show that this function was delegated by the Department" to CSW. Secretary's Reply at 24. This defense to the Plaintiffs' agency claim is weak. Contrary to the Secretary's contention, the Plaintiffs do identify certain functions which the Secretary performs, such as administration of the HEA, which are delegated to the participating schools. *See, e.g.,* Complaint at 23–24, ¶ 51 (by regulation, the Secretary designated each school as a "fiduciary of the Secretary in administering Higher Education Act pro-

grams"); *id.* at 24–25, ¶ 56 (Secretary paid CSW an administrative cost allowance).

Second, the Secretary incorrectly assumes that an agency relationship cannot exist when a private entity, such as CSW or a Guaranty Agency, undertakes the performance of tasks at the request of the government pursuant to a government program. The Supreme Court has frequently described independent entities which provide administrative assistance to the government as "agents" of the government. *Heckler v. Community Health Services*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), is among those Supreme Court cases. In *Community Health Services*, the Court described the Travelers Insurance Company, which was serving as a fiscal intermediary in the Medicare program, as a "responsible Government agent." 467 U.S. at 51, 104 S.Ct. at 2218. In fact, the Court referred to agency principles throughout the *Community Health Services* Opinion. Thus, the Court cannot dismiss this claim under Fed.R.Civ.P. 12(b)(6) on the Secretary's bald assertion that an agency relationship cannot arise pursuant to a federal program. The existence of an agency relationship is ordinarily a question of fact which, depending upon the existence of any disputed issues of material fact, is more appropriately addressed on summary judgment or at trial. *See, e.g., Henderson v. Charles E. Smith Management, Inc.,* 567 A.2d 59, 62 (D.C. 1989).

Plaintiffs charge that the Secretary is "estopped from insulating [himself] from the school-related claims and defenses of the students as a result of [his] pattern of control as hereinbefore alleged." Complaint at 74, ¶ 268. Plaintiffs make this estoppel claim "based on the statements of the Defendants' agent, CSW, and based on the omissions of the Defendants themselves." Pl.Opp. at 59–60. The Secretary has moved to dismiss this claim, contending that equitable estoppel cannot lie against

---

**6.** The Court expresses no view as to whether Plaintiffs could assert such a contract-based de-

fense in light of the facts of this case.

the Government because, *inter alia*, Plaintiffs have not, and cannot, allege affirmative misconduct on the part of the Secretary. *See* Secretary's Motion at 25–30. The Secretary also moves to dismiss the estoppel claims made with respect to the actions of CSW and the Guaranty Agencies as alleged agents of the Secretary.

The Secretary is correct that the Complaint does not support an estoppel claim with respect to actions performed by the Secretary himself. In order to successfully maintain an estoppel claim against the government, Plaintiffs must demonstrate the existence of an egregious injustice and must convince the Court that estopping the government will not cause undue damage to the public interest. *See, e.g., Int'l Org. of Masters v. Brown*, 698 F.2d 536, 551–552 (D.C.Cir.1983). Moreover, the Plaintiffs may assert an estoppel claim against the government only in the event of affirmative misconduct by the government or its agents. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 2469–2470, 110 L.Ed.2d 387 (1990) (although equitable estoppel "will not lie against the Government as against private litigants," the Court recognized that "some type of affirmative misconduct might give rise to an estoppel against the government"). Plaintiffs have not made an allegation of affirmative misconduct with respect to the Secretary's own actions. Even if the Secretary "knew or should have known" that CSW was not technically eligible to participate in the GSL program, *see* Complaint at 43, ¶ 158, this allegation is not tantamount to an allegation of affirmative misconduct by the Secretary. The Court cannot, as a matter of law, infer affirmative misconduct from the Secretary's inaction. As explained in Section I.D., *infra*, the Secretary has broad enforcement prerogatives and may decline to suspend a school for policy reasons.

However, Plaintiffs have stated an estoppel claim against the Secretary with respect to the acts of the Secretary's alleged agent, CSW. The Plaintiffs have alleged affirmative misconduct on the part of CSW. *See* Complaint at Counts IV and V.

This alleged misconduct implicates the school's educational program as well as the school's compliance with the HEA rules and regulations. *See* Complaint at 11–12, ¶ 2 (CSW flaunted the rules and failed to properly credit and calculate student refunds). Moreover, the Plaintiffs have alleged that they "were induced by CSW's false and misleading representations to take out guaranteed student loans." Complaint at 25, ¶ 59. Assuming for purposes of the instant Motion to Dismiss that CSW is the agent of the Secretary, these estoppel claims may proceed.

Although, as explained above, the Plaintiffs have alleged the existence of an agency relationship between the Secretary and the Guaranty Agencies sufficient to withstand a motion to dismiss, the Court must dismiss the Plaintiffs' estoppel claim with respect to the alleged action or inaction of the Guaranty Agencies. In order to withstand a motion to dismiss the estoppel claim, the Complaint must allege (1) that the Guaranty Agencies made a false representation or wrongly concealed material facts; (2) that the Guaranty Agencies intended for the students to act upon this representation or omission; (3) that the Guaranty Agencies had knowledge of the misrepresentation or omission; (4) that the students did not have knowledge of the actual situation; and (5) that the students reasonably relied upon the misrepresentation or omission to their detriment. *See, e.g., Int'l Org. of Masters v. Brown, supra; Perpetual Bldg. Ltd. Partnership v. District of Columbia*, 618 F.Supp. 603 (D.D.C. 1985). Plaintiffs cannot make out an estoppel claim with respect to the acts or omissions of the Guaranty Agencies because, by Plaintiffs' own admission, the Guaranty Agencies did not make any statement or representation upon which the students could have placed reliance. *See* Complaint at 37, ¶ 119 ("the consumer never met with, or talked to, anyone from the banks or guaranty agencies"). In fact, the students did not even know of the Guaranty Agencies' existence at the time these transactions were consummated. *See Id.* ("As a result of this regulatory framework, the

class members had no knowledge that any entity was involved in the guaranteed student loan except 'the government' [Defendant Secretary of the U.S. Department of Education] and the school"). In light of the utter lack of contact between the Plaintiffs and the Guaranty Agencies, the Complaint fails to state an estoppel claim with respect to the Guaranty Agencies as a matter of law. *See Banze v. American Int'l Exports, Inc.,* 454 A.2d 816, 818 (D.C.1983). Plaintiffs' resort to the equities and pleas to prevent manifest injustice cannot not salvage an estoppel claim which falls short of the required technical elements. *American Savings v. Bell,* 562 F.Supp. 4, 9 (D.D.C.1981).

C. *The Higher Education Act Does Not Wholly Preempt State Law Governing the Enforceability of Student Loan Promissory Notes.*

Plaintiffs also challenge the enforceability of the student loan promissory notes on the basis of state law. *See* Complaint at 72–74, ¶¶ 266(b), (g) (claims against all defendants); *id.* at 77, ¶ 274 (Guaranty Agencies). Although the Secretary concedes that the Higher Education Act, 20 U.S.C. § 1070, *et seq.,* does not close off state law contract remedies, the Secretary contends that none of the D.C. statutes are applicable to the case at bar. For the reasons indicated below, the Court finds that state law defenses are available to student borrowers. However, the Court shall deny the Secretary's Motion to Dismiss the state law defenses asserted by the Plaintiffs herein with respect to D.C.Code § 28–3809(a)(3) and § 28–3904 (1981). The Secretary's Motion to Dismiss the remaining state law claims pursuant to D.C.Code §§ 28–3808, 28–3807, and D.C.Mun.Regs., tit. 16, §§ 1212, shall be granted, however.

■ The 85–page Opinion issued by Judge Copenhaver in *Tipton v. Secretary of Education, supra,* exhaustively discusses the preemption issue presented herein. Upon analyzing *California Fed. Sav. & Loan v. Guerra,* 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1986) and *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the *Tipton* Court correctly concluded that the HEA does not explicitly preempt state law defenses, and that the statute, the legislative history and the agency's subsequent regulations leave certain matters to be regulated by the states. However, as the *Tipton* Court found, state law is preempted to the extent that it would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), or to the extent that compliance with both federal and state law would be impossible. *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963).

■ Given the range of the *Tipton* opinion, there is no need for a full exegesis of the case law and regulatory framework. Rather, the Court shall address the arguments advanced by the Guaranty Agency and lender Defendants in opposition to the *Tipton* ruling and shall apply the *Tipton* standards to the District of Columbia law. First, the Guaranty Agency and lender Defendants contend that the HEA occupies the student loan field. According to these Defendants, Congress did not intend for Plaintiffs to resort to state law because Congress specifically addressed the potential for school misconduct by providing for administrative remedies. *See* HEAF Motion to Dismiss at 15–16. This claim is not convincing. Although the HEA did not provide Plaintiffs with a remedy to prosecute school wrongdoing as a matter of federal law, the HEA and its implementing regulations do not divest Plaintiffs of any contract-based defenses. *See Tipton, supra,* 768 F.Supp. at 553–560. *See generally* 20 U.S.C. § 1077(a)(2)(A) (federal government can insure only those Stafford loans which are valid obligations "under the applicable law"). *See also* 34 C.F.R. § 682.206(d)(1) (1986) (lenders in the GSL program "shall obtain from the borrower an executed legally-enforceable promissory note for each loan"). Congress delineated which state contract laws would be

preempted[7] and, by implication, suggested that the remaining contract defenses would lie. Finally, as *Tipton, supra,* 768 F.Supp. at 553, pointed out, there is no indication that Congress meant to exclude from liability those lenders which had a close connection to a participating school, provided that the close connection is not purely a product of the HEA itself. In short, because Congress did not manifest any desire to deprive consumers of student loans of their traditional state-based contract remedies, Defendants cannot overcome the "presumption against finding pre-emption of state law in areas traditionally regulated by States." *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). *See also Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 716, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985); *Florida Lime & Avocado Growers, supra,* 373 U.S. at 146, 83 S.Ct. at 1219 (regulation to prevent deception of consumers is within the power traditionally reserved to states).

 The Guaranty Agency and lender Defendants also protest that the *Tipton* Court ignored the commercial realities of the GSL program. *See* HEAF Motion, *supra,* at 14. According to these Defendants, application of state law contract defenses "would convert student loans into an investment nightmare." *Id.* at 17. These claims are also not well-founded. Although the GSL program depends upon the infusion of capital from the private sector, the program is not designed to insulate wayward lenders and Guaranty Agencies from liability stemming from fraudulent activities or unfair business practices. Rather, as the *Tipton* Court explained, the HEA permits students to proceed under state law if the actions or omissions of the lender or Guaranty Agency would render recission of the underlying promissory note appropriate. *See Tipton, supra,* 768 F.Supp. at 560–563. *See Veal v. First*

*American Sav. Bank, infra,* 914 F.2d at 914–915, n. 1 (dicta) ("[I]f sued by a lender in state court for collection of one of these [GSL] loans, each of these plaintiff students would be entitled to assert any defenses available under state law that are applicable to his or her particular loan"). Allowing students to protect themselves from vendors who abuse the GSL program comports with broad social purposes advanced by the HEA. *Cf. United States v. Griffin,* 707 F.2d 1477, 1482–1483 (D.C.Cir. 1983) (preserving students' state law defenses for FISLP loans "seems a sound way to protect the interests of student borrowers and to deter lenders from abusing the program").

The lenders and Guaranty agencies' argument also proceeds on the erroneous premise that "lenders have been encouraged to make funds available to the program around the country without being burdened by oversight responsibilities that may apply in other consumer loan situations." HEAF Motion, *supra,* at 20. The Defendants do not specify the onerous oversight responsibilities which allegedly inhere in the "other consumer loan situations." In fact, this claim completely ignores the Defendants' due diligence responsibilities under the HEA for which they may be subject to civil liability. *See* 20 U.S.C. § 1082(h); 34 C.F.R. §§ 682.206–208; 682.411. While the federal government endeavored to make the student loan program an attractive investment for private lenders, nothing in the statute or its legislative history suggests that the government endeavored to protect lenders and Guaranty Agencies from the litigation risks inherent in the business of extending and collecting loans. Lending institutions and other commercial entities can rarely avoid the risk of lawsuits in which the law of another state might govern the outcome.[8] To the extent possible, the govern-

---

7. *See, e.g.,* 20 U.S.C. § 1099 (1982) (loans shall not be subject to state law disclosure requirements); 20 U.S.C. § 1078(d) (any other state and federal usury law does not apply); 20 U.S.C. § 1091a(a) (1986) (state statutes of limita-

tions do not apply); 20 U.S.C. § 1091a(b) (1986) (student may not raise infancy claims).

8. Ironically, Crestar Bank considered the possible application of state law to disputes arising from the loan agreement and included a choice of law clause, specifying that the HEA *and* Vir-

ment's loan guarantee already compensates for the inability to raise interest rates, to impose additional closing costs, or to otherwise cover the costs associated with default or legal challenge to the enforceability of the promissory note.

 Finally, the lenders and Guaranty Agencies point to 20 U.S.C. § 1082(g)(5) which provides, in relevant part, that:

> If a loan affected by a violation, failure, or substantial misrepresentation is assigned to another holder, the lender or guaranty agency responsible for the violation, failure, or substantial misrepresentation shall remain liable *for any civil money penalty provided under paragraph (1) of this subsection*, but the assignee shall not be liable for *any such civil money penalty.*

(emphasis added). According to these Defendants, this provision incapacitates the students' efforts to rescind the loan contract or to seek other money penalties from the assignees of a loan due to a lender's wrongdoing. *See* HEAF Motion, *supra,* at 21. Although the District Court in *Graham, infra,* 125 F.R.D. at 693, credited this argument, this Court finds that the Defendants' argument does not pass muster. *See Tipton, supra,* 768 F.Supp. at 556, n. 31 (declining to follow *Graham* Court's analysis of this provision). Section 1082(g)(5) does not address contract-based defenses at all. By its own terms, this provision only speaks to the transferability of a "civil money penalty provided for under paragraph (1) of this subsection." Thus, § 1082(g)(5) provides that a subsequent holder is not responsible for a prior holder's violation of the statute or regulations, absent a specific finding by the Secretary to that effect pursuant to the procedures established by § 1082(g)(1). Had Congress wished to insulate subsequent assignees from all liability arising from the actions of the prior holder, Congress would have omitted the specific reference to the "civil penalties provided by paragraph (1)" in favor of a provision much broader than the current version of § 1082(g)(5). At bot-

tom, the language of the statute clearly suggests Congress' intent not to enact the type of blanket immunity which the Defendants seek herein. *See, e.g., Consumer Products Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intent to the contrary, the language must ordinarily be regarded as conclusive.")

1. Plaintiffs Have Stated A Cause of Action Pursuant to D.C.Code § 28-3809(a)(3) and the Secretary's Motion to Dismiss this Claim Shall Be Denied.

 Plaintiffs seek to assert state law claims and defenses against all Defendants pursuant to D.C.Code § 28-3809 (1981). *See* Complaint at 72-73, ¶ 266(b) (against all Defendants); *id.* at 77-78, ¶ 274 (only against Guaranty Agencies). D.C.Code § 28-3809 (1981) provides:

> (a) A lender who makes a direct installment loan for the purpose of enabling a consumer to purchase goods or services is subject to all claims and defenses of the consumer against the seller arising out of the purchase of the goods or service if such lender acts at the express request of the seller, and—
>
>> (1) the seller participates in the preparation of the loan instruments, or
>>
>> (2) the lender is a person or organization controlled by or under common control with the seller, or
>>
>> (3) the seller receives or will receive a fee, compensation, or other consideration from the lender for arranging the loan.
>
> (b) The lender's liability under this section may not exceed the amount of the loan. Rights of the debtor can only be asserted affirmatively in an action to cancel and void the sale from its inception, or as a defense to or set-off against a claim by the lender.

The Secretary of Education contends that a claim under § 28-3809(a)(1) is preempted by the HEA, and that the Plaintiff has not

ginia law would govern any claims arising from the transaction. *See Crestar Bank's Memoran-*

*dum, supra,* at 18; Ex. 4 to Plaintiffs' Complaint.

adequately alleged claims under the remaining subdivisions. For the reasons that follow, the Court finds that the Plaintiffs have stated a claim pursuant to § 28–3809(a)(3). All remaining claims under this provision shall be dismissed.

In a typical GSL transaction, the private lender acts at the request of the student. *See* 34 C.F.R. § 682.102(a) (1986). However, the school must certify the application before it is forwarded to the private lender. *Id.* Once the application is forwarded to the private lender, the lender obtains a loan guaranty from either a Guaranty Agency or the Secretary. *Id.* Thus, while the student actually initiates the process, the typical lender does communicate with the school/seller. For purposes of imposing liability under § 28–3809, however, it is critical to distinguish between this general procedure of forwarding an application, which is mandated by the HEA, and a transaction in which the school makes an "express request" for the lender to make the loan in spite of the lender's considered business judgment to do otherwise. The Court must draw this distinction because a state law claim cannot lie to the extent that it would penalize participants in the GSL program for following Congressional directives. *Tipton, supra,* at 768 F.Supp. at 557, 558 n. 32. Plaintiffs have made sufficient allegations to surpass this hurdle. Plaintiffs allege that the named bank Defendants had a "business arrangement" with CSW, *see* Complaint at 51, ¶ 178, that the banks "knew or had reason to know" of the school's high default and withdrawal rates, *id.* at ¶ 182, and "failed to exercise reasonable business judgment." *Id.* at ¶ 183.

 Preemption law impedes the Plaintiffs' attempt to impose liability pursuant to § 28–3809(a)(1), however. The GSL program requires the seller/school to participate in the preparation of the loan documents. *See* 20 U.S.C. § 1078(a)(2) (school must provide information to the lender concerning the student's estimated cost of attendance, estimated financial assistance and a schedule for the disbursement of loan proceeds). The Plaintiffs practically concede that a law-abiding participant in the HEA would confront liability. Plain-

tiffs state that "[t]he regulatory framework in effect resulted in the school setting the loan amount." Complaint at 37, ¶ 120. *See also* Pl.Opp. at 29. At bottom, Plaintiffs' Complaint dramatizes the fact that any school which followed the chain-of-command specified in the HEA would run afoul of D.C.Code § 28–3809(a)(1). Accordingly, the Court must dismiss Plaintiffs' claim under this subsection.

 Plaintiffs also have not stated a cognizable claim under D.C.Code § 28–3809(a)(2). This provision is not wholly preempted by the HEA; it is consistent with the HEA's overall mission to protect students from overbearing corporate conglomerates which ignore the due diligence duties of the GSL program for mutual pecuniary gain. Plaintiffs have not alleged that CSW and the two named bank Defendants are commonly controlled as that term is interpreted in the corporate law context, however. Although Plaintiffs do allege that CSW was an agent of the banks, *see* Complaint at 50, ¶ 176, the delegation of certain responsibilities to the school does not fall within the range of transactions covered by § 28–3809(a)(2). Subsection (a)(2) imposes liability when "the lender is ... controlled by ... the seller," and does not speak to the converse situation in which the lender gives directions to the seller. Furthermore, preemption principles do not permit the Court to expand the contractual liability of the lenders and Guaranty Agencies merely because they are under the "common control" of the Secretary through the HEA apparatus. Imposition of liability in these circumstances would surely frustrate the achievement of Congressional objectives, as these private parties would confront state law liability solely because of their involvement in a program sponsored by the federal government. *See Tipton, supra.*

 Plaintiffs have stated a claim pursuant to D.C.Code § 28–3809(a)(3): Plaintiffs' allegation that the lenders received an administrative fee from the Secretary pursuant to the HEA, *see* Complaint at 24–25, ¶ 56, does not make out a cognizable claim. As the Court explained in *Tipton, supra,* Plaintiffs cannot assert such a claim for it would penalize activity expressly per-

mitted by Congress. However, Plaintiffs have made a sufficient allegation that the school/seller receives "other consideration" within the meaning of § 28–3809(a)(3) in return for directing borrowers to the two named lenders. Plaintiffs have alleged that the school and the lender enjoy a "business arrangement", *see* Complaint at 51, ¶ 178, that the banks "knew or had reason to know" of the school's high default and withdrawal rates, *id.* at ¶ 182, and "failed to exercise reasonable business judgment" in making loans to CSW students. *Id.* at ¶ 183. *See also* Pl.Opp. at 30, n. 6 ("CSW also received other consideration in that the banks in return for the business that CSW generated for them relaxed their business judgment and ignored CSW's high default rate and high withdrawal rate.") In order to prove their § 28–3809(a)(3) claim at trial, though, Plaintiffs must demonstrate that the lender intentionally provided this preferential treatment in return for the business provided by CSW, *i.e.*, Plaintiffs must prove that there was an explicit *quid pro quo* between the lender and CSW. If Plaintiffs can make out this claim, Plaintiffs can rescind the contract as void *ab initio* or can assert the claim as a defense in a collection action. *See* D.C.Code § 28–3809(b) (1981).

 The Guaranty Agencies and Sallie Mae further argue that, even if the Plaintiffs could successfully assert a claim, D.C.Code § 28–3809 does not permit Plaintiffs to assert claims against entities other than original lender. According to these Defendants, § 28–3809 only subjects the original lender to the contract defenses. *See* HEAF Memorandum, *supra*, at 28. Basic contract law requires the Court to reject this argument. First, the Plaintiffs and the Secretary correctly state, and Defendants essentially concede, that the stu-

dent loan contracts are not negotiable instruments. *See* Secretary's Motion to Dismiss at 18; Pl.Opp. at 33–35. *See also* D.C.Code § 28:3–104(1).[9] Because these loan instruments are not negotiable instruments, the Defendants cannot qualify as holders in due course and thereby preclude Plaintiffs from raising defenses attributable to the original lender's conduct.

 Second, because the Guaranty Agencies and other secondary holders of these GSLs cannot qualify as holders in due course, traditional assignment principles resolve this dispute. As assignees, the Guaranty Agencies and other secondary holders step into the shoes of the lender from whom they have taken the promissory notes and are subject to any defenses that the student/obligee may assert against the assignor/lender. *See also* D.C.Code § 28:9–318(1) (1981) (unless account debtor has contracted otherwise, the assignee of an account is subject to "all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom"). *See generally* 3 E.A. Farnsworth, *Farnsworth on Contracts*, § 11.8, at 106 (1990) ("the assignee is vulnerable to defenses of the obligor that affect the enforceability of the obligor's agreement with the assignor") (citing, Restatement (Second) of Contracts § 336(1)).

2. Although the FTC Holder Rule Does Not Provide Plaintiffs Relief as a Matter of Federal Law, Plaintiffs Have Stated a Claim for Failure to Include the Notice of Defenses Clause Pursuant to D.C.Code § 28–3904 and the Motions to Dismiss with Respect to this Claim Shall Be Denied.

 Plaintiffs contend that their student loan contracts are void for failure to

---

9. The GSLs do not "contain an unconditional promise or order to pay a sum certain in money and no other promise," as required by D.C.Code § 28:3–104(1)(b). The promise to pay is not unconditional, as that term is defined by D.C.Code § 28:3–105, because, for certain time periods relevant to this action, GSLs were dischargeable in the event of death, disability or discharge in bankruptcy. *See* 20 U.S.C. § 1087. Moreover, the GSLs are not payable at a definite time or on demand as required by D.C.Code § 28:3–104(1)(c). The time and amount of the

eventual repayment obligation are not conclusively established at the time the student signs the promissory note due to numerous contingencies which are expressly allowed by operation of federal law. *See, e.g.,* 34 C.F.R. § 682.-209 (1986) (lenders and Guaranty Agencies may establish a grace period before repayment is due); 34 C.F.R. § 682.210 (1986) (authorizing deferments from repayment); 34 C.F.R. § 682.-211 (1986) (Secretary or the lender may forbear from collecting the loan). *See also* D.C.Code § 28:3–109.

include the notice of claims and defenses required by Federal Trade Commission's (FTC) Holder Rule which is codified at 16 C.F.R. § 433.[10] *See* Complaint at 73, ¶ 266(c). In the alternative, Plaintiffs contend that the Court should imply the FTC Holder Rule into the contracts and thereby allow Plaintiffs to assert certain enumerated state law claims and defenses against the lenders, Guaranty Agencies and the Secretary. *See* Complaint at 74, ¶¶ 269(a)–(f). While the Secretary takes no position on whether the FTC Holder Rule applies to student loan transactions, the Guaranty Agencies, the lenders and Sallie Mae contend that the Holder Rule need not be included in student loan promissory notes. Upon further consideration of the evidence presented herein, the Court finds that the FTC Holder Rule does apply to student loan transactions. Moreover, although the Holder Rule does not provide a remedy as a matter of federal law, D.C.Code § 28–3904 does provide a cause of action against all Defendants for failure to include the notice of defenses clause in the promissory notes. Accordingly, the Secretary's Motion to Dismiss the state-based Holder Rule claims shall be denied.

The FTC Holder Rule applies only to those consumer credit sales which are consummated through purchase money loans[11] or which qualify as financed sales.[12] *See* 16 C.F.R. § 433 (1976).[13] As the regulatory language makes clear, the FTC Holder Rule incorporates the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and Regulation Z, 12 C.F.R. 226, *et seq.* Congress expressly exempted student loans from the purview of the Truth in Lending Act in 1982, *see* 15 U.S.C. § 1603(6) (1982), and the FTC expressly exempted student loans from Regulation Z soon thereafter. *See* 12 C.F.R. § 226.3(f) (1983). Based on these statutory and regulatory amendments, the Defendants (with the exception of the Secretary of Education) contend that the FTC Holder Rule does not apply to student loan transactions. *See Veal v. First American Sav. Bank, supra*, 914 F.2d at 914 (declining to apply FTC Holder Rule to student loans); *Higher Education Assistance Foundation v. Merritt*, slip op., Civ. 91–1576 (Fla.Cir.Ct., Sept. 19, 1991) (citing *Veal*); *Molina v. Crown Business Institute, N.Y.C., Inc.*, slip op., Civ. No. 24332/88 (N.Y.Sup.Ct., Sept. 10, 1990) (citing *Veal*).

The Plaintiffs urge the Court to follow a recent informal FTC staff opinion advising that the FTC Holder Rule does apply to student loans. *See* July 24, 1991 Letter to Mr. Jonathan Sheldon from Jean Noonan of the FTC, Ex. 5 to Plaintiffs' Complaint. However, this staff opinion, by its own terms, is "not binding on the Commission," *id.* at 5, and carries no legal significance in this Court. Moreover, the persuasive value of this informal opinion is minimal since the FTC has vacillated on this issue. As Plaintiffs' own exhibits indicate, a 1990 FTC

---

**10.** The FTC Holder Rule declares it is "an unfair or deceptive act or practice ... for a seller, directly or indirectly" to accept payment or to receive a contract when the contract does not contain the following notice: "Any holder of this consumer-credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." 16 C.F.R. § 433.2.

**11.** The regulations define a purchase money loan as "a cash advance which is received by a consumer in return for a "Finance Charge" *within the meaning of the Truth in Lending Act and Regulation Z*, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to a creditor or (2) is affiliated with the creditor by common control, contract, or business arrangement." 16 C.F.R. § 433.1(d) (1975) (emphasis added).

**12.** A financed sale is one in which there exists any extension of credit "in connection with a credit sale *within the meaning of the Truth in Lending Act and Regulation Z.*" 16 C.F.R. § 433.1(e) (emphasis added).

**13.** The FTC Holder Rule covers consumer credit contracts and purchase money loans. *See* 16 C.F.R. § 433.2(a) (covering consumer credit contracts); 16 C.F.R. § 433.2(b) (addressing the acceptance of the proceeds of any purchase money loan in satisfaction of the consumer debt). As defined 16 C.F.R. § 433.1(i), a "consumer credit contract" is an "instrument which evidences or embodies a debt arising from a 'Purchase Money Loan' or a 'financed sale'."

staff opinion advised that student loans are *not* covered by the Holder Rule. *See* June 20, 1990 Letter to Mr. Joseph Esposito from Mr. John LeFevre of the FTC, Ex. 6 to Plaintiffs' Complaint (retracting this prior informal staff opinion).

Plaintiffs also argue that well-established principles of statutory interpretation render the 1982 amendments to the Truth in Lending Act inapplicable to the FTC Holder Rule.[14] The FTC promulgated the Holder Rule in 1975—long before the amendments to the Truth in Lending Act exempted student loans from the Act's coverage. At the time the Commission adopted the FTC Holder Rule, the Truth in Lending Act's definitional terms for "purchase money loan" and "finance charge" encompassed student loans, as evidenced by the fact that student loans were specifically exempted from the Truth in Lending Act and Regulation Z in 1982. *See Florida Gulf Coast Bldg. & Constr. Trades Council v. Nat'l Labor Relations Bd.,* 796 F.2d 1328, 1341 (11th Cir.1986), *aff'd sub nom, Edward DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (absent legislative history to the contrary, "an exemption exists only to exempt something which would otherwise be covered"). *See generally* 2A C. Sands, *Sutherland on Statutory Construction* § 47.11, at 53 (N. Singer ed., 4th ed. 1991). According to the Plaintiffs, the standard rules of statutory construction dictate that the later-enacted amendments to the Truth in Lending Act do not influence the definitional terms from that statute which the Commission specifically incorporated into the FTC Holder Rule as of 1975.

A statute [or regulation] of specific reference incorporates the provisions referred to from the statute as of the time of adoption without subsequent amendments, unless the legislature has expressly or by strong implication shown its intention to incorporate subsequent amendments within the statute.

2A, *Sutherland's Statutory Construction, supra,* § 51.08 at 516 (4th ed., 1984) (citing *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838)). *See also Curtis Ambulance of Florida, Inc. v. Bd. of County Commissioners, Shawnee County,* 811 F.2d 1371, 1378–79 (10th Cir.1987) (same).

Nothing in the language or legislative history of the Truth in Lending Act or the FTC Holder Rule indicates that Congress or the FTC intended to include any and all subsequent amendments to the Truth in Lending Act in the Holder Rule's definitional terms. The two provisions are not interrelated. The Truth in Lending Act addresses only a limited range of practices in the banking arena. In fact, Congress has authorized the Federal Home Loan Bank Board and the Federal Reserve to promulgate rules to prevent deceptive or unfair trade practices by banking institutions and has recommended that these agencies look to the FTC for guidance. *See* 15 U.S.C. § 57a(f) (1974). Moreover, in amending the Truth in Lending Act in 1982, Congress did not purport to limit the FTC's ability to protect against consumer fraud. The legislative history of the Truth in Lending Act suggests that student loans were removed from the coverage of that Act and also exempted from state law disclosure rules because the Higher Education Act, *supra,* already governed the lenders' disclosure obligations with respect to stu-

---

**14.** The Guaranty Agencies, the lenders and Sallie Mae contend that resort to principles of statutory interpretation is inappropriate because there does not exist any ambiguity. *See* HEAF Reply at 37. Defendants' argument that the FTC Holder Rule's definitional terms are unambiguous fails, however. A glance at the language of the Holder Rule could direct one to 15 U.S.C. §§ 1602, 1605 which set out the definitional terms for a "finance charge." Under a reading of these provisions alone, the student loans would qualify as purchase money loans which

have a finance charge. The FTC regulation is ambiguous, though, because in referring the Truth in Lending Act's definitional terms, one may also notice that § 1603 exempts student loans from the requirements of the Truth in Lending Act. The fact that the FTC itself has flip-flopped in articulating a position regarding the applicability of the Holder Rule to student loans only underlines the ambiguity in the language of the Holder Rule. Principles of statutory interpretation exist in order to resolve such conflicts.

dent loans. *See* S.Rep. No. 641, 97th Cong., 2d Sess. 91 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3134. Nothing in the legislative history of the Truth in Lending Act indicates that Congress made a determination that student loans, in toto, should be removed from the protection of consumer protection laws. Furthermore, the FTC rulemaking does not indicate that the FTC desired the definitional terms for the Holder Rule to change depending upon subsequent exemptions applied to the Truth in Lending Act. *See* 40 Fed.Reg. 53,506 (Nov. 18, 1975). Rather, at the time the FTC Holder Rule was promulgated, the Commission identified for-profit proprietary schools as an area in which consumers needed protection. *Id.* at 53,510.

Thus, there is no intent on the part of Congress or the FTC to circumscribe the reach of the Holder Rule by way of later-enacted amendments to the Truth in Lending Act. Based upon the traditional precepts of statutory interpretation, the Court finds that the definitional terms in the FTC Holder Rule should be read without regard to the 1982 amendments to § 1603(6) of the Truth in Lending Act. These definitional terms in the FTC Holder Rule clearly suggest that the FTC Holder Rule applies to the student loans at issue in this case.[15]

■ Although the FTC Holder Rule applies to these student loan transactions, the Guaranty Agencies and lenders correctly note that it does not afford Plaintiffs any relief as a matter of federal law. Violation of the FTC Holder Rule does not furnish private parties with a cause of action as a matter of federal law. *See Holloway v. Bristol–Meyers Corp.*, 485 F.2d 986 (D.C.Cir.1973) (enforcement of the Act solely entrusted to FTC).[16] In wielding its

remedial powers, the FTC may impose a cease and desist order, 15 U.S.C. § 45, or may institute a civil action pursuant to 15 U.S.C. § 57b. Because an enforcement action has not been instituted against the CSW,[17] there exists no basis upon which this Court could rescind the contract as a matter of federal law. *See* 15 U.S.C. §§ 57b(a), (b) (1975) (in a civil action commenced by the Commissioner, the Court can fashion appropriate relief including "recission or reformation of contracts"). Moreover, since the Court can act only upon the initiation of proceedings by the appropriate government agency, Plaintiffs here cannot circumvent these procedures by asking the Court to imply the Holder Rule into the contracts as a matter of federal law. Finally, Plaintiffs have no rights under the student loan contracts as a matter of federal law when the FTC's notice of defenses clause is not contained therein. *See Vietnam Veterans of America v. Guerdon Industries, Inc.*, 644 F.Supp. 951, 964–65 (D.Del.1986) ("any rights against holders ... are contractual rights only, and can be enforced by plaintiffs only if their contracts contained this provision.")

■ Plaintiffs do allege, however, that D.C.Code § 28–3904 (1981) permits them to rescind the student loan contracts due to the failure to include the FTC notice of defenses clause in the GSL promissory notes. *See* Complaint at 74–75, ¶¶ 269(a)–(c) (against the Guaranty Agencies and the Secretary). The Secretary, as well as the lenders and Guaranty Agencies, move to dismiss this state law claim on various grounds. Upon review of the arguments presented, the Court shall deny the Motion

15. While the *Veal* Court reached a different conclusion, there is no mention of these statutory interpretation issues in the Opinion. The *Molina, supra,* and *Merritt, supra,* cases merely cite *Veal* without any discussion of this issue.

16. State law may create a private right of action, however. *See* W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–302:09 (1984 & 1991 Supp.). Plaintiffs assert that D.C.Code § 28–3901 (1981) *et seq.* creates a private right of action against the Defendants for failure to include the notice required by the FTC

Holder Rule in these student loan contracts. *See* Complaint at 79, ¶ 269; Pl.Opp. at 12–20. The Court shall address these claims, *infra.*

17. The FTC has no jurisdiction over banking institutions and could not bring such an action with respect to any practices of the lenders. *See* 15 U.S.C. § 45(a)(2) (FTC jurisdiction does not extend to banks); 15 U.S.C. § 57b (Federal Home Loan Bank Board and the Federal Reserve promulgate rules to prevent deceptive or unfair trade practices by banking institutions).

to Dismiss and shall allow this state-based claim to proceed.

The Secretary claims § 28–3904 is preempted because it would frustrate the achievement of federal objectives by encouraging students to assert non-meritorious defenses in order to avoid repayment. Secretary's Reply at 10. This claim proves too much, as it supports depriving students of any available defenses. Nothing in the HEA or its legislative history suggests that Congress intended to close off access to state law remedies due to the fear of non-meritorious claims. The Secretary's argument also fails because the Court cannot assume, without evaluating the circumstances of the loan transactions, that failure to include a notice of defenses clause in the contract is a non-meritorious defense. Moreover, allowing students to obtain relief pursuant to § 3904 would not necessarily frustrate the student loan program. Section 3905(k) permits the Court to fashion whatever relief is appropriate, and does not mandate the recission of every student loan contract.[18] For example, the Court could imply the notice of defenses clause into the contract and then place the burden on the Plaintiff to prove a substantive defense to repayment. Alternatively, the Secretary is free to argue that the failure to include the notice of defenses clause does not create substantive unfairness because there are no contract-based defenses of which the Plaintiffs could be deprived.

■ The Guaranty Agencies also contend that the failure to include a notice of defenses clause in the contract cannot sustain a claim because claims "based on state law regarding the enforceability of GSLs are preempted, especially where, as here, the DOE approved the note without the language required by the FTC Rule." HEAF Reply at 42. This contention is misplaced for two reasons. First, Defendants' argument fails to the extent that it rests on their preemption theory. For the reasons described, *supra*, the Plaintiffs may pursue any available state law defenses to the extent that these claims do not frustrate

the achievement of federal objectives. Second, the Defendants have not advanced any basis upon which the Secretary's approval of the notes could constitute a separate basis for preemption. A contract with the government is also subject to existing law. *See* 15 S. Williston, *A Treatise of the Law on Contracts, supra*, § 1763, at 207, n. 12. While the Secretary's representations may give rise to a cross-claim vis-a-vis the Guaranty Agencies, these representations do not prevent the Plaintiffs from stating a claim for relief herein.

■ Citing *Nelson v. Nationwide Mortgage Corp.*, 659 F.Supp. 611 (D.D.C.1987), the Defendants claim that the District of Columbia Consumer Protection Procedures Act (CPPA), D.C.Code § 28–3901 (1981) *et seq.*, does not apply to this transaction. *Nelson* stands for the proposition that the CPPA was not "intended to apply to every commercial transaction involving a District of Columbia resident, whenever and with whomever that transaction occurs." 659 F.Supp. at 616. The *Nelson* Court dismissed the CPPA claims because none of the fraudulent conduct occurred in the District and because the "actions in reliance—the signing of the loan papers—also occurred in Virginia." *Id.* The instant case presents a closer connection to the District of Columbia. Although only one Plaintiff is a resident of the District, *see* Complaint at 3–4, ¶¶ 1–9, the alleged perpetrator of the fraud, CSW, was incorporated here. Moreover, some of the Plaintiffs applied for the GSLs at the offices of the Culinary School of Washington. Complaint at 55, ¶ 193 (Plaintiff Stokes signed loan papers at CSW's offices); *id.* at 65, ¶ 230 (Plaintiff Hildebrand applied for loans at CSW's offices). Finally, Plaintiffs allege that the student loan checks were indorsed to CSW at CSW's offices in Washington. These allegations present a sufficient nexus to assert a claim under the CPPA.

The CPPA enacts a broad scheme to protect consumers from unscrupulous merchants connected with the supply side of the consumer transaction. *Howard v.*

---

**18.** At this time, the Court expresses no view as to whether § 28–3903(c)(2)(E) and § 28–3905(k) precludes the Court from exercising subject matter jurisdiction over such a claim.

*Riggs Nat'l Bank,* 432 A.2d 701, 709 (D.C. 1981). A merchant includes one who sells consumer credit as well as those entities which take an assignment of the credit account and continue the extension of credit to the consumer. *See* D.C.Code § 28–3901(3), (7). *See also Lawson v. Nationwide Mortgage Corp.,* 628 F.Supp. 804, 807 (D.D.C.1986) (Family Federal Savings & Loan was a merchant under CPPA because it was in the business of providing consumer credit); *Chrysler First Financial Services Corp. v. Fuller,* Civ. No. 5686–87, slip op., *published in* 52 Wash. Law Reporter 537 (D.C.Sup.Ct., Mar. 17, 1988) (merchant includes those entities which, by assignment, are involved in the continuing extension of credit to the consumer in an installment sales contract). In this case, the Plaintiffs assert that the Secretary and the Guaranty Agencies were involved in the continuing extension of credit to the students. *See* Complaint at 16, ¶ 19 (alleging that the Guaranty Agencies and the Secretary are "creditors"). Plaintiffs also allege that the Guaranty Agencies are either "original lenders or assignees" of the notes. *See* Complaint at 5–7, ¶¶ 13–14, 17–20. Accordingly, by its terms, the CPPA applies to these parties.

▮ Section 28–3904(r) makes it unlawful for any merchant to "make or enforce unconscionable terms or provisions of sales or leases." The Guaranty Agencies contend that the Plaintiffs have not made out a claim of unconscionability because Plaintiffs have not isolated any provision in the contract which is manifestly unfair. According to these Defendants, unconscionability cannot rest upon an assertion that an additional term, such as the notice of defenses clause, should have been included in the contract. *See* HEAF Reply at 42. Defendants' interpretation of unconscionability is too stingy, however. A contract as a whole may be unconscionable due to an "overall imbalance of the whole bargaining contract." 15 S. Williston, *A Treatise on the Law of Contracts,* § 1763A, at 225 (W. Jaeger ed., 3rd ed., 1973 & Supp.1991).

Thus, the alleged failure to include a notice of defenses clause in the standard form student loan contract may enable Plaintiffs to void [19] the contract if the Plaintiffs can demonstrate "the absence of meaningful choice ... together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker–Thomas Furniture Company,* 350 F.2d 445, 449 (D.C.Cir.1965). Whether the failure to include the notice of defenses clause gives rise to an unconscionable agreement is a question of law for the Court to decide once the record in this case is fully developed. *Id.* at 450 (remanding question of unconscionability to trial court for development of factual record). *See also* 15 S. Williston, *A Treatise on the Law of Contracts, supra,* § 1763A, at 217.

▮ Plaintiffs also assert that the failure to include the notice of defenses clause constitutes an unfair trade practice within the meaning of § 3904(x). Complaint at 75, ¶ 269(a). *See also* Pl.Opp. at 15. This provision prohibits merchants from "sell[ing] consumer goods in a condition or manner not consistent with that warranted by operation ... of federal law." D.C.Code § 28–3904(x). The Guaranty Agencies argue that this clause does not apply to the Defendants because "the non-school defendants were not the *sellers* of services, the school was." HEAF Reply at 42 (emphasis in original). This focus on the actual "seller" is unavailing, though, in light of *Chrysler First Financial Services Corp. v. Fuller, supra.* As the *Chrysler First* case made clear, an entity which provides consumer credit is a seller of goods and services. Moreover, a consumer can maintain a CPPA action against an assignee of the seller which was extending credit to the consumer. *Id.* Accordingly, the Plaintiffs have stated a claim under this provision.

3. Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted With Respect to D.C.Code § 28–3808 (1981) and the Motions to Dismiss Shall Be Granted.

---

**19.** As explained above, however, the students are not necessarily entitled to void the contracts pursuant to § 3904(r) and § 3905(k). A Court may deem it appropriate, given the strong federal interest in the student loan program, to fashion more limited relief.

Plaintiffs contend that D.C.Code 28–3808 (1981)[20] allows them to defend against payment of their student loans due to CSW's alleged misconduct. *See* Complaint at 73, ¶ 266(b) (against all Defendants); *id.* at 77–78, ¶ 274 (with respect to Guaranty Agencies). The Secretary moves to dismiss this claim, making two principal arguments. First, the Secretary contends that, in order for 28–3808 to apply to those consumer credit sales,[21] the bank would have to be an assignee of the rights of the seller of the consumer good, *i.e.*, the school. Second, the Secretary argues that, by the terms of the statute, the students can only assert a claim under 28–3808 as a defense to a collection action, and cannot employ the provision as affirmative grounds for relief. Upon further consideration of the claims herein, the Court shall grant the Secretary's Motion and shall dismiss these claims.

Section 28–3808 does not define the meaning of "seller" and "assignee." *See also* D.C.Code § 28–3802 (1981) (setting out definitional terms for this Chapter of the Code). On this basis, Plaintiffs attempt to argue creatively, claiming that the lender is a "seller" in an overall consumer credit sale and that the Guaranty Agencies therefore qualify as "assignees." However, the structure[22] of Chapter 38 of the D.C.Code makes clear that § 28–3808 does not apply to a consumer credit sale in which a private lender finances the purchase of the school's services. Section 28–3809 addresses the scenario in which a consumer of goods and services seeks to assert claims arising from the seller's activities against the lender. *See* discussion, *infra*, at Section I.C.1. Section 28–3809 imposes more stringent requirements for lender liability than does § 28–3808. The legislature's clear decision to impose more rigorous requirements on parties seeking to assert claims against a lender which finances consumer purchases must guide the Court's interpretation of § 28–3808. For this reason, the Court cannot interpret the terms "seller" and "assignee" in 28–3808 to apply to this case; the GSL contract is one between the lender and the student and therefore falls under the aegis of § 28–3809.

Plaintiffs' claim under § 28–3808 fails for an independent reason. Plaintiffs assert 28–3808 as a affirmative grounds for a declaratory judgment, injunctive relief and recission of the GSL promissory notes. As all of the Defendants point out, § 28–3808(b) makes clear that this provision "can only be asserted as a matter of defense to or set-off against a claim by the

**20.** D.C.Code § 28–3808 provides: "(a) With respect to a consumer credit sale, an assignee of the rights of the seller or lessor is subject to all claims and defenses of the consumer or lessee arising out of the sale notwithstanding any terms or agreements to the contrary, but the assignee's liability under this section may not exceed the amount owing to the assignee at the time of the assignment. (b) Rights of the consumer or lessee can only be asserted as a matter of defense to or set-off against a claim by the assignee."

**21.** Citing *Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory School, Inc.*, 514 A.2d 1152, 1159 (D.C.1986), Defendant Crestar Bank argues that the student loan transactions in this case are not "consumer credit sales" for purposes of Chapter 38 of the D.C.Code because the students were not consumers of goods and services. This claim fails, however, because the *Save Immaculata* case focused on the fact that the Immaculata school was a non-profit educational institution. Thus, the *Immaculata* holding mirrors the distinction which is made in the applicable law with respect to educational institutions. The FTC has the ability to impose regulations only with respect to for-profit schools, *see* 15 U.S.C. § 44, and the D.C.Code likewise imposes special requirements only on privately-owned proprietary schools. *See* D.C.Mun.Regs. tit. 16, § 1200, *et seq.* Unlike the Immaculata school, CSW was a for-profit institution in the business of providing culinary training. Students attending such for-profit schools are consumers of the goods and services offered by those entities and they are afforded protection from the FTC, *see, e.g.*, 40 Fed.Reg. at 53510, and from the D.C. government. *See* D.C.Mun.Regs. tit. 16, § 1200, *et seq.*

**22.** The structure of the overall statute is an essential aid in the construction of an ambiguous term or provision thereof. *See American Fed. of Gov't Employees, Local 2782 v. Federal Labor Relations Authority*, 803 F.2d 737, 740 (D.C.Cir.1986) ("it is a generally accepted precept of statutory interpretation that statutes or regulations are to be read as a whole, with 'each part or section ... construed in connection with every other part or section.'") (citing 2A, *Sutherland on Statutory Construction, supra*, § 46.-05, at 90).

assignee." Thus, on this basis alone, Plaintiffs' claims at ¶¶ 266(b) and 274 of the Complaint cannot lie.

4. Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted With Respect to D.C.Code § 28–3807 (1981) and the Motions to Dismiss Shall Be Granted.

█ Plaintiffs also assert that D.C.Code § 28–3807 (1981) permits them to raise defenses against the lenders, Guaranty Agencies and the Secretary. *See* Complaint at 73, ¶ 266(g).[23] All Defendants, including the Secretary of Education, have moved to dismiss this claim pursuant to Fed.R.Civ.P. 12(b)(6). Upon further consideration, the Court finds that this state law provision is preempted by the HEA; imposing liability under § 28–3807 would penalize participants in the GSL program for adhering to the scheme specifically devised by Congress. Accordingly, the Secretary's Motion to Dismiss this claim shall be granted.

Section 28–3807 discourages the use of negotiable instruments and other transferable commercial paper in consumer credit sales. Permitting Plaintiffs to invoke such a state law provision would frustrate Congress' clear preference to encourage the transfer of student loan promissory notes. The GSL program expressly permits private lenders to assign their promissory notes to other eligible lenders, Guaranty Agencies, or the Student Loan Marketing Association ("Sallie Mae"). *See* 20 U.S.C. § 1085(i) (defining "holder" as "an eligible lender who owns a loan"); § 1085(d) (defining "eligible lender" to include entities such as banks, Guaranty Agencies and Sallie Mae which have purchased loans on the secondary market). *See also* 20 U.S.C. § 1087–2(a) (1986) (establishing Sallie Mae to "serve as a secondary market and warehousing facility" and "to facilitate secured transactions involving student loans").

Moreover, when the Secretary acts pursuant to its reinsurance agreement with a Guaranty Agency, Congress has authorized the Secretary to demand an assignment of the loan from the Guaranty Agency "if the Secretary determines that the protection of the Federal fiscal interest so requires." *See* 20 U.S.C. § 1078(c)(8). The HEA also envisions situations in which the Secretary makes interest subsidy payments to the holder of the loan rather than to the original lender. *See* 20 U.S.C. § 1078. Asserting a claim on the basis of § 28–3807 would penalize participants in the GSL program who have bought, sold or otherwise transferred student loans with the approval and accommodation of Congress. The Supremacy Clause does not permit such a result. *See California Fed. Sav. & Loan v. Guerra, supra,* 479 U.S. at 280–81, 107 S.Ct. at 689 (improper to apply State law when doing so would be an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (citations omitted). Accordingly, Plaintiffs' § 28–3807 claim shall be dismissed.

5. Plaintiffs Have Not Stated a Cause of Action Pursuant to the D.C. Licensing Regulations for Proprietary Schools and the Motions to Dismiss Shall Be Granted.

█ Plaintiffs also allege that they may assert defenses arising from CSW's alleged misconduct pursuant to D.C.Mun.Regs. tit. 16, §§ 1212.1, 1212.2. *See* Complaint at 73, ¶ 266(b) (asserting § 1212.2 against all Defendants); *id.* at 75, ¶ 269(e) (asserting § 1212.2 against the Secretary and Guaranty Agencies); *id.* at 75, ¶ 269(f) (asserting violation of § 1212.1 against Secretary and Guaranty Agencies). All of the Defendants move to dismiss these claims. The Court shall grant the Motions to Dismiss.

Section 1212.2 provides that "a school *shall not negotiate or assign* a promissory note ... without first endorsing on the face of it a legend stating 'Any holder takes this

---

**23.** D.C.Code 28–3807 provides: "(a) In a consumer credit sale, no seller shall take or otherwise arrange for the consumer to sign an instrument, except a check, payable "to order" or "to bearer" as evidence of the credit obligation of the consumer. (b) Any holder of an instrument prohibited by this subsection (a) of this section 28–3807, if he takes it with knowledge of a violation of this section, takes it subject to all claims and defenses of the consumer up to the amount owing on the transaction total at the time of the assignment."

instrument subject to the terms and conditions of the contract which gave rise to the debt evidenced hereby.'" D.C.Mun.Reg. tit. 16, § 1212.2 (emphasis added). Plaintiffs do not allege that the school made an assignment of the loan. Rather, Plaintiffs allege that the banks made an assignment of the loan to the Guaranty Agencies. *See* Complaint at 42, ¶ 146; *id.* at 50, at ¶ 175. Plaintiffs also fail to allege that the school negotiated the loan. Plaintiffs merely state that there was an "origination" relationship between CSW and the banks "whereby the school informed students of the availability of the GSL programs and assisted students applying for federally guaranteed student loans from the Banks." *See* Complaint at 50, ¶¶ 173–174. The school's role in counselling students and in transmitting documents to the lender was specifically dictated by the terms of the HEA and cannot form the basis of a claim under this provision. *See Tipton, supra.* Although Plaintiffs also charge that "[e]ach of the Defendant Banks delegated to CSW certain functions normally performed by lenders before making loans," Complaint at 50, ¶ 176, this allegation does not contain any statement that the school negotiated the loan. If anything, this allegation implicitly admits that the banks, and not the school, controlled the transaction. Section 1212.2 regulates only those proprietary schools which issue their own promissory notes and accordingly does not apply to CSW.

■ Section 1212.1 provides that

[a] school shall not use any contract provision, oral or written representation, or other device or means to deny or abridge the benefits of any applicable Federal or District law intended to protect consumers or credit purchasers.

Although this provision is much broader than § 1212.2, it also does not apply to the facts of this case. The *school* has not used the promissory note as a means to deny or abridge any rights created by applicable Federal or District law. Rather, Plaintiffs have alleged that the lenders, Guaranty Agencies and the Secretary have used the terms of the note, specifically the absence of the notice of defenses clause, in order to stifle the students' ability to raise contract-based defenses. The school's acceptance of the proceeds of the students' promissory notes is not tantamount to using the note as a means to thwart the students' contract defenses. Using the proceeds of the note is a wholly distinct act, which has no bearing on the students' subsequent ability to assert defenses against the maker of note. This section addresses those situations in which the school sues upon its own contracts and promissory notes and has no relevance to this case.

D. *Because Plaintiffs Do Not Have a Private Cause of Action Under the Higher Education Act as a Matter of Law, These Claims Shall Be Dismissed.*

■ Plaintiffs contend that the Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et seq.*, affords students, the primary beneficiaries of the GSL program, a private right of action to ensure that the Secretary fulfills his responsibilities under the Act. *See* Complaint at 76–77, ¶¶ 271–273 (HEA claims against Secretary); *id.* at 73, ¶ 266(b) (claim against all Defendants on basis of unspecified federal statutory and regulatory law). According to the Plaintiffs, a private right of action would complement the Secretary's enforcement duties with respect to the banks, schools and Guaranty Agencies. Moreover, Plaintiffs argue that the HEA contemplates suits against the Secretary for failure to fulfill his responsibilities under the Act. *See* 20 U.S.C. § 1082(a)(2). The Secretary moves to dismiss Plaintiffs' claims for relief under the HEA. Upon further review, the Court concludes that the HEA does not furnish a basis upon which Plaintiffs can assert claims against the Secretary.

The HEA does not expressly permit students to sue the Secretary for failure to enforce, and abide by, the rules and regulations. Plaintiffs acknowledge this fact. *See* Def.Opp. at 81. Given this lack of explicit statutory authority, the Court must determine whether Congress intended to afford students an implied right of action

against the Secretary for inadequate performance of his duties. The Supreme Court articulated a four-part test in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), to govern this inquiry: (1) whether the Plaintiffs constitute "one of the class for whose especial benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create a remedy or to deny one"; (3) whether inferring a private right of action would be "consistent with the underlying purposes of the legislative scheme"; and (4) whether the cause of action "is traditionally relegated to state law ... so that it would be inappropriate to infer a cause of action based solely on federal laws."

An application of the *Cort v. Ash* test to the case at bar demonstrates that the HEA does not provide an implied cause of action to the Plaintiffs. Congress enacted the HEA with the interests of students in mind. *See, e.g.,* H.R. 1086, 94th Cong., 2d Sess. 5 (1976) (legislation designed "in the service of the student, and of the community"); 34 C.F.R. § 682.100(a)(2) (1988) (the GSL program "encourages the making of loans to undergraduate, graduate and professional students"). However, Congress' desire to open up educational opportunities for all students is not tantamount to an expression of legislative intent in favor of equipping students with a private right of action against the Secretary and other participants in the GSL program with respect to the fulfillment of their due diligence responsibilities. The GSL program has flourished because it balances the need to encourage private-sector lender participation, the need to limit the potential reinsurance losses which could be incurred by the government and the Guaranty Agencies, and the need to open the gates of higher education to all students. Because

the HEA strives to maintain this often-delicate interrelationship and because the program is designed to benefit all of the participants, it is unlikely Congress intended to subject the entire program to the upheavals of student-led challenges to its implementation. *See Graham v. Sec. Sav. and Loan Assoc.,* 125 F.R.D. 687, 693, n. 7 (N.D.Ind.1989) (citing H.R.Rep. No. 520, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 3141, 3168), *aff'd on other grounds sub nom., Veal v. First Amer. Sav. Bank,* 914 F.2d 909 (7th Cir.1990); *Phillips v. Penna. Higher Educ. Assistance Agency,* 497 F.Supp. 712 (W.D.Pa. 1980), *rev'd on other grounds,* 657 F.2d 554 (3d Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1284, 71 L.Ed.2d 466 (1982) (due diligence requirements enacted for benefit of federal government to prevent excessive reinsurance losses).

The provisions of 20 U.S.C. § 1082[24] reveal that Congress did not intend to imply a private right of action against the Secretary with respect to enforcement decisions made pursuant to the HEA. Plaintiffs' emphasis on § 1082(a)(2) is misplaced. This provision does not create a cause of action, but constitutes only the Secretary's consent to be sued, subject to specified terms and conditions, for actions arising from the exercise of his official duties. *Cf. United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (Tucker Act does not create any cause of action and merely confers jurisdiction over the sovereign). Plaintiffs incorrectly claim that this reading of § 1082 eviscerates the provision of any meaning. *See* Pl.Opp. at 79. Section 1082(a)(2) expands the basis for jurisdiction against the Secretary by waiving the amount in controversy requirement and by permitting parties to proceed in any federal district court.

**24.** In relevant part, 20 U.S.C. § 1082 provides: "In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may—... (2) sue and be sued in any court of record of a State having general jurisdiction or in any district court of the United States and such district courts shall have jurisdiction of civil actions arising under this part without regard to the amount in controversy ..., but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control and nothing herein shall be construed to except litigation arising out of activities under this part from the applications of sections 509, 517, 547, and 2679 of Title 28."

Interpreting § 1082(a)(2) as a jurisdictional statute comports with the overall structure of the HEA. Congress' decision to invest broad discretion in the Secretary undercuts Plaintiffs' attempt to imply a cause of action and supports the view that Congress subjected the Secretary only to legal actions arising for breach of contract or upon other explicit legal authority. *Cf. United States v. Testan*, 424 U.S. at 400, 96 S.Ct. at 954 (claims arising from contractual relationship or arising from monies paid by the Government do not require explicit statutory authority in order to receive payment of money). Examples of the Secretary's discretion abound.[25] The Secretary *"may"* impose upon lenders or guaranty agencies a civil penalty not to exceed $25,000 for each violation of the HEA. *See* 20 U.S.C. § 1082(g)(1) (emphasis added); 20 U.S.C. § 1094(c)(1)(D) (discretion in applying civil penalties to schools). Moreover, Congress granted the Secretary great latitude in undertaking enforcement proceedings, in determining the severity of any sanctions, and in determining when those sanctions may be lifted. *See* 20 U.S.C. § 1082(h) (lenders and Guaranty Agencies); 20 U.S.C. § 1094(c)(2)(A), (B) (schools). By delegating such powers to the Secretary without detailing the standards for the Secretary to follow, Congress created a system in which the Secretary's best judgment would guide the GSL program. This legislative scheme also implicitly indicates Congress' intention to remove the Secretary's enforcement decisions from the scrutiny of courts.[26]

Case precedent weighs heavily against granting an implied cause of action. All of the Courts which have considered the issue presented herein have declined to adopt the Plaintiffs' position. *See Graham v. Sec. Sav. and Loan Assoc.*, 125 F.R.D. 687, 693–94 (N.D.Ind.1989), *aff'd on other grounds sub nom., Veal v. First Amer. Sav. Bank*, 914 F.2d 909 (7th Cir.1990); *Hudson v. Academy of Court Reporting, Inc.*, 746 F.Supp. 718 (S.D.Ohio 1990); *St. Mary of the Plains College v. Higher Educ. Loan Program*, 724 F.Supp. 803 (D.Kan.1989); *Phillips v. Penna. Higher Educ. Assistance Agency*, 497 F.Supp. 712 (W.D.Pa.1980), *rev'd on other grounds*, 657 F.2d 554 (3d Cir.1981), *cert. denied*, 455 U.S. 924, 102 S.Ct. 1284, 71 L.Ed.2d 466 (1982). *See also* L. Tribe, *American Constitutional Law* § 3–23 (2d ed. 1988) ("For the most part, the *Cort* test has been applied to deny implication of a cause of action except where the test of the legislative history suggests that Congress specifically intended one.").

The only case permitting a private right of action pursuant to the Higher Education Act is *De Jesus Chavez v. LTV Aerospace Corp.*, 412 F.Supp. 4 (N.D.Tex. 1976). In *De Jesus Chavez*, the District Court allowed Plaintiffs to sue lenders and corporate sponsors for charging excessive interest and imposing other illegal costs. Applying the test established in *Cort v. Ash, supra*, the Court implied a private cause of action in behalf of the students upon finding that HEA was established for the benefit of students and that the students were "possessed of specific rights"

25. Plaintiffs cite *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), for the general proposition that courts should enforce the "specific directives" in a statute. *See* Pl.Opp. at 84. *Berkovitz* is distinguishable from the instant case. *Berkovitz* rests upon the specific statutory directives imposed upon the FDA in approving a polio vaccine. *See Berkovitz*, 108 S.Ct. at 1961 (citing 42 U.S.C. § 262(d): licenses for vaccines may be issued "only upon a showing that the establishment and the products for which a license is desired meet standards ..."). The HEA statute imposes no requirement that the Secretary investigate every participant in the GSL program on an on-going basis, nor does the HEA demand that the Secretary undertake a particular course of action if a

violation is uncovered. Furthermore, Plaintiffs' reliance on *Berkovitz, supra*, is puzzling; the case addresses the discretionary function exemption in the Federal Tort Claims Act, 28 U.S.C. § 2680(a), which Plaintiffs contend is inapplicable to this case.

26. Although Plaintiffs do not reference the Administrative Procedure Act, 5 U.S.C. § 552 *et seq.*, as a basis for the instant lawsuit, the APA could not provide Plaintiffs a cause of action here; there is no law for a reviewing Court to apply in evaluating the Secretary's exercise of his enforcement and oversight responsibilities. *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

with respect to interest rates and repayment conditions. *De Jesus Chavez*, 412 F.Supp. at 6. *De Jesus Chavez* is of dubious precedential value, however. The decision rested upon the Court's finding that students had a "right" to certain levels of interest on their GSL loans. However, courts have refused to find that students have a right to enforce the HEA's due diligence requirements. *See, e.g., Phillips v. Penna. Higher Educ. Assistance Assoc., supra* (due diligence requirements were enacted for the benefit of the federal government and not for the student); *Hudson v. Academy of Court Reporting, supra,* 746 F.Supp. at 720 (declining to adhere to *De Jesus Chavez* because it is "too broad"). Even assuming, *arguendo*, that students have a right to expect due diligence, the HEA does not guarantee that the due diligence will ferret out all fraud in the GSL program. In fact, the HEA does not contemplate that the Secretary, the lenders or the Guaranty Agencies will evaluate the quality of the school. This task is left to accrediting institutions. *See* 20 U.S.C. § 1085. Although students had a right to expect that the school was an accredited institution, *see* 20 U.S.C. §§ 1085, 1094, the HEA does not promise students a satisfactory education and does not entitle students to any particular remedy should a school's program not meet expectations.

E. *Plaintiffs Cannot Assert Claims Against the Secretary on the Basis of an Ultimate Lender Theory.*

 Plaintiffs also proceed under a novel theory of vicarious liability whereby the Secretary, as well as the Guaranty Agencies, is subject to state law claims and defenses because their "control over the enterprise and activities of the GSL program" transforms them into the "ultimate lenders." Complaint at 74, ¶ 267. The Secretary moves to dismiss this claim. For the reasons stated herein, the Court shall grant the Secretary's Motion and shall dismiss this claim.

The Plaintiffs' claim fails as a matter of law. The claim rests upon an analogy to the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* Courts interpreting the Truth in Lending Act have imposed liability upon an entity which, by its role in the transaction, is *de facto* making extension of credit. *See* Pl.Opp. at 49–58. The Truth in Lending Act analogy has little relevance to this situation, however. As Plaintiffs themselves must concede, student loans have been exempted from the Truth in Lending Act. *See also* 15 U.S.C. § 1603(6) (1982). *See* Pl.Opp. at 9–11. Thus, the case precedent interpreting the Truth in Lending Act's liability provisions cannot impact upon the Secretary here.[27]

III. THE GUARANTY AGENCIES' MOTIONS TO DISMISS SHALL BE GRANTED IN PART AND DENIED IN PART

Upon consideration of the claims herein with respect to the Defendant Guaranty Agencies, the Court finds that the Plaintiffs have stated causes of action against these Defendants pursuant to D.C.Code § 28–3809(a)(3) (1981) and D.C.Code § 28–3904 (1981) for the reasons explained with respect to the Secretary's Motions to Dismiss. Accordingly, the Guaranty Agencies' Motions to Dismiss shall also be denied with respect to these claims. For the reasons articulated with respect to the Secretary's Motion to Dismiss, the Guaranty Agencies' Motions to Dismiss shall be granted with respect to all claims under the Higher Education Act, 20 U.S.C. § 1070 *et seq.;* D.C.Code § 28–3808 (1981); D.C.Code § 28–3807 (1981); D.C.Mun.Regs. tit. 16, §§ 1212.1, 1212.2; the "ultimate lender theory"; and estoppel. However, the Court shall address the Plaintiffs' HEA-based claims separately with respect to the Guaranty Agencies, as there are some additional issues which need to be resolved for the non-governmental Defendants. Finally, the Guaranty Agencies' Motions to Dismiss the claims arising under the alleged origination relationship between the school and

---

**27.** To the extent that Plaintiffs "ultimate lender" argument is an agency-based argument, the claim merges with those made in the Complaint at ¶ 270 and ¶ 274. The Court shall address these agency-based claims, *infra*, at Section III.F.

the lenders shall be granted and these claims shall be dismissed as to the Guaranty Agencies.

### A. *Plaintiffs Do Not Have A Private Right of Action Against the Guaranty Agencies Under the Higher Education Act.*

The Plaintiffs claim that the Guaranty Agencies failed in performing the due diligence responsibilities prescribed by the Higher Education Act, *supra.* On this basis, Plaintiffs assert that the HEA provides them with a private cause of action whereby they may assert state law claims and defenses arising out of the school's undetected wrongdoing against the Guaranty Agencies. *See* Complaint at 78–79, ¶¶ 275, 276 (HEA-based claims against Guaranty Agencies). The Court shall grant the Guaranty Agencies' Motions to Dismiss these claims.

As explained with respect to the Secretary, the HEA does not furnish the Plaintiffs with a private cause of action. *See* discussion, *supra,* at Section I.D. Although private entities often stand in a different position than government agency defendants and are often more susceptible to private enforcement lawsuits, such is not the case here. The language of the statute itself and the overall enforcement scheme defeat the Plaintiffs' efforts to imply a cause of action against the Guaranty Agencies. The statute reveals that Congress considered the possibility that Guaranty Agencies would not adhere to the HEA's prerequisites, and established the procedures whereby the *Secretary* would monitor and punish any such non-compliance. *See, e.g.,* 20 U.S.C. § 1082(h)(3); 20 U.S.C. § 1094; 34 C.F.R. §§ 668.71–.97 (Secretary's power to enforce HEA requirements imposed upon the participating schools); 20 U.S.C. § 1082(g); 34 C.F.R. § 682.700–.711; 34 C.F.R. § 682.413(c) (Secretary's power to impose penalties upon lenders or Guaranty Agencies). Congress also considered the possibility of student complaints about the GSL program, and determined that the

Secretary should screen such complaints prior to undertaking enforcement action. *See, e.g.,* 20 U.S.C. § 1094(c)(1)(E) (Secretary has power to institute emergency action against an institution if the Secretary *"receives information, determined by the Secretary to be reliable"* that the institution is violating any provision of law or is misusing federal funds) (emphasis added); 20 U.S.C. § 1082(j) (Secretary may take emergency action against lenders if he "receives information, determined by the Secretary to be reliable" of violation of law or misuse of federal funds). This screening function makes sense, for it prevents a disgruntled student or ruthless competitor from besmirching the reputation of a school or lender by lodging an administrative complaint. In any event, by including this "screening" provision in the HEA, Congress envisioned the Secretary, and not the students, to be the focal point for the initiation of any corrective action. For all of these reasons, the Court shall dismiss these claims.

### B. *Because Plaintiffs Cannot Assert Claims Against the Guaranty Agencies on the Basis of an Origination Relationship, the Court Shall Dismiss these Counts of the Complaint with Respect to the Guaranty Agencies.*

Plaintiffs seek to assert claims arising out of CSW's alleged wrongdoing against the Guaranty Agencies due to the alleged "origination" relationship between the lenders and CSW. Complaint at 72, ¶ 266(a); *id.* at ¶ 174 (alleging the existence of an origination relationship between CSW and the banks). *See also* discussion, *supra,* at Section I.A. (defining an origination relationship). The Secretary of Education agrees that, when an origination relationship exists, a student may assert any defenses which he or she has with respect to CSW's activities against the lender and the Guaranty Agencies. *See* Secretary's Motion to Dismiss at 15. Some of the Guaranty Agencies [28] contend that there is no rule

---

**28.** The Nebraska Student Loan Program and the Texas Guaranteed Student Loan Corporation

contend that the origination rule applies and that it evidences Congress' intent to preempt the

or regulation on this subject, and that any "policy" articulated by the Secretary has no binding effect on third parties. For the reasons discussed herein, the Court finds, as a matter of law, that the existence of an origination relationship between the lenders and CSW does not permit students to assert claims arising from the school's alleged misconduct against the Guaranty Agencies. Accordingly, the Guaranty Agencies' Motions to Dismiss shall be granted and these claims shall be dismissed.

The Plaintiffs and the Secretary contend that 34 C.F.R. §§ 682.200 (1986), 682.-206(a)(2) (1986), and 682.512(e) (1986) permit students, as a matter of law, to assert claims against the lender based upon the origination relationship. *See* Secretary's Motion to Dismiss at 15; Pl.Opp. at 4–8. However, these regulations contain no such provision. Section 682.200 merely defines an origination relationship. A perusal of the plain language of § 682.206(a)(2) reveals that the existence of an origination relationship does not give rise to any penalty, and does not enable the student to assert school-related defenses against the lender:

> Except as may be authorized by the Secretary, a lender may not delegate its loan-making functions to the school unless the school has an origination relationship with the lender. If that relationship exists, the lender may rely in good faith upon statements of the borrower contained in the loan application, but may not rely on statements made by the school in the application. A non-school lender that does not have an origination relationship with a school may rely upon statements of both the borrower and the school that are contained in the application....

Rather, as § 682.206(a)(2) indicates, the existence of an origination relationship only imposes additional due diligence responsibilities upon the lender. While a lender's failure to perform these duties could invite the wrath of the Secretary, *see* discussion, *supra*, at Section II.D., the student has no recourse under the statute or the regulations. Finally, 34 C.F.R. § 682.512(e)[29] does not apply to the GSL program; it applies only to the Federal Insured Student Loan Program ("FISLP"), through which the federal government offers direct guarantees to lenders which cannot access a Guaranty Agency. *See Veal v. First American Sav. Bank*, 914 F.2d 909, 914 (7th Cir.1990) (rejecting claim that FISLP standards apply to GSL program); *Tipton v. Secretary of Education, supra*, 768 F.Supp. at 566–570. The Secretary agrees that FISLP is "not directly at issue here." *See* Secretary's Motion to Dismiss at 4, n. 2. Moreover, even if FISLP were relevant to an analysis of the GSL program rules, § 682.512(e) does not speak to the students' ability to raise defenses against the lender; it merely limits the federal government's reinsurance liability for such loans.

The parties also advert to 34 C.F.R. § 682.604(f) (1989) and the proposed regulation to be codified at 34 C.F.R. 682.215, *see* 55 Fed.Reg. 48,353 (Nov. 20, 1990), as possible bases of support for the Plaintiffs' and the Secretary's position. Neither of these provisions enacts an origination-based defense, however. First, 34 C.F.R. § 682.604(f) speaks only in the most indirect terms about the impact of an origination relationship. That regulation, which covers only those loans made after August 24, 1989,[30] requires the school to conduct counselling with each GSL borrower, either in person or by videotape presentation, pri-

---

application of state law to student loan enforcement disputes. *See* Motion to Dismiss of Nebraska Student Loan Program and Texas Student Loan Corporation at 19.

29. 34 C.F.R. § 682.512(e) provides that "[a] loan that is originated by a school is treated, for purposes of paragraph (d) of this section, as if it were a loan made and still held by the school." Paragraph (d) addresses the lender's entitlement to reimbursement from the federal government

in the event of default under the FISLP program, codified at 20 U.S.C. § 1079.

30. *See* 54 Fed.Reg. 35188–89 (Aug. 24, 1989) (effective date for this provision is August 24, 1989). Thus, only the following named Plaintiffs would be covered by this provision: Michael Jackson, Complaint at 52, ¶ 185; Ricky Stokes, Complaint at 55, ¶ 193; Don Johnson, Complaint at 59, ¶ 203; and Edwin Figueroa, Complaint at 67, ¶ 240–244.

or to the first disbursement of the proceeds of that borrower's first GSL loan. 34 C.F.R. § 682.604(f)(1). In these counselling sessions, the school must

> in the case of a student borrower of a GSL or SLS program loan (other than a loan made or originated by the school), emphasize that the borrower is obligated to repay the full amount of the loan even if the borrower does not complete the program, is unable to obtain employment upon completion, or is otherwise dissatisfied with or does not receive the educational or other services that the borrower purchased from the school.

34 C.F.R. § 682.604(f)(2)(iii). As the Defendants point out, this provision does not define the school's counselling responsibilities with respect to loans originated by the school, nor does this provision address the availability of state-based defenses for matters unrelated to the quality of the educational services provided by the schools.

Second, the proposed regulation to be codified at 34 C.F.R. § 682.215 does not support the argument of the Plaintiffs and the Secretary. This provision, standing alone, is of no legal significance because it is only a proposal and is not yet a final rule. Moreover, the terms of the proposed rule enervate any claim that the Secretary's "consistent" policy should apply to the lenders in this case. Although the proposed 34 C.F.R. § 682.215(b)(1) would enable students to assert defenses based on the school's misconduct if the school originated the loan, the proposal would permit lenders and other subsequent holders of the loan to escape liability if, prior to the first disbursement of the loan, the lender formally disavows responsibility for school misconduct. 34 C.F.R. §§ 682.215(b)(2), (c). Accepting the Secretary's and the Plaintiffs' argument in the face of this disclaimer policy smacks of unfairness; those lenders extending loans after the rule is finalized may insulate themselves from liability through the disclaimer mechanism while those lenders who made loans prior to the effective date of the new rule had no opportunity to limit their respective liabilities. The Court cannot find, without some other source of legislative or regulatory authori-

ty, that the Congress intended for such an inequitable outcome.

Plaintiffs place great reliance upon certain letters and policy statements issued by the Secretary in which the Secretary promised to abstain from collection of those defaulted student loans arising from an origination relationship. *See* Complaint at 30, ¶ 81. *See also* discussion, *supra,* at Section II.A. According to Plaintiffs, the secretary's allegedly long-standing policy prevents any of the Defendants from undertaking collection efforts against the former CSW students because the Court should give special weight to the agency's interpretation of the statute. *See* Pl.Opp. at 6, citing *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). At the very least, Plaintiffs contend that the existence of this policy is a question of fact which cannot be adjudicated on a Motion to Dismiss. Pl. Opp. at 6.

Plaintiffs arguments are unavailing. For purposes of evaluating the instant Motions to Dismiss, the Court assumes that the Secretary does have a longstanding "policy" of permitting students to raise defenses arising from the school's mis-, mal-, or nonfeasance when that school originated the loan. However, as discussed above, this policy has not yet been codified in law or regulation. Thus, the Court must address a simple legal question: whether this "policy" is binding on third parties such as the Guaranty Agencies. The case law in this Circuit clearly suggests that such a pronouncement, which has not been subjected to the notice and comment procedures required by the APA, 5 U.S.C. § 553, cannot bind third parties such as the Guaranty Agencies. *See Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528, 536–539 (D.C.Cir.1988) (policy statements do not even bind the agency); *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1322–24 (D.C.Cir.1988) (absent compliance with § 553 notice and comment procedures, agency may only consider the directive as a non-binding policy which third parties are free to challenge); *Community Nutrition Institute v. Young,* 818 F.2d 943, 949

(D.C.Cir.1987).[31] Accordingly, the Guaranty Agencies' Motions to Dismiss these claims shall be granted.

## IV. THE LENDERS' MOTIONS TO DISMISS SHALL BE GRANTED IN PART AND DENIED IN PART

 Upon consideration of the claims herein with respect to the lender Defendants Crestar Bank and First National Bank of Toledo and for the reasons previously articulated in this Opinion, the Court finds that the Plaintiffs have stated causes of action against these Defendants pursuant to D.C.Code § 28–3809(a)(3) (1981) and D.C.Code § 28–3904 (1981). Accordingly, the lenders' Motions to Dismiss shall be denied with respect to these claims. However, for the reasons expressed with regard to the Secretary and the Guaranty Agencies, the lenders' Motions to Dismiss shall be granted with respect to all claims under the Higher Education Act, 20 U.S.C. § 1070 *et seq.;* D.C.Code § 28–3808 (1981); D.C.Code § 28–3807 (1981); D.C.Mun.Regs. tit. 16, §§ 1212.1, 1212.2. Furthermore, as in the case of the Guaranty Agencies, the alleged origination relationship between the school and the lenders cannot support a cause of action against the lenders as a matter of federal law and the lenders' Motions to Dismiss this origination-based claim shall be granted.

 However, Defendant Crestar Bank has also moved to dismiss the Complaint for failure to state a claim due to the alleged applicability of Virginia law in the Crestar Bank loan transactions. *See Memorandum of Points and Authorities in Support of Crestar Bank's Motion to Dismiss* at 13. Crestar Bank contends that Virginia law, and not the law of the District of Columbia, governs the resolution of any contract dispute with Crestar's named borrowers. According to Crestar, the parties contracted for the application of Virginia law under which the Plaintiffs would have no state law defenses. *See* Crestar's Reply Memorandum at 23. Plaintiffs seek to avoid this conclusion by arguing that the existence and enforcement of the Virginia choice-of-law clause is a question of fact best reserved for summary judgment. *See* Pl.Opp. at 31–32. The Court must agree with the Plaintiffs and deny Crestar's Motion to Dismiss at this time.

The Rules of Civil Procedure do not prevent the Court from considering the existence of this jurisdictional clause on a motion to dismiss because the Plaintiffs attached copies of promissory notes containing the clause to the Complaint. *See* Ex. 4 to Plaintiff's Complaint. *See generally* 5A C. Wright & A. Miller, *Federal Practice and Procedure, supra,* § 1363, at 465–466 (1990 & Supp.1991) (consideration of matters attached to the Complaint do not automatically convert a motion to dismiss into one for summary judgment); *Monongahela Appliance Co. v. Community Bank & Trust,* 393 F.Supp. 1226 (N.D.W.Va.1975), *aff'd,* 532 F.2d 751 (4th Cir.1976), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). However, the Plaintiffs are correct that any determination regarding the enforceability of this choice-of-forum clause is premature because Plaintiffs have not been afforded an opportunity for discovery on the issues of unconscionability.[32] *See generally* 15 S. Williston, *A*

---

**31.** While the *Tipton* Court exempted lenders from the origination rule, that Court held that the Secretary's longstanding policy would bind the Guarantee Agencies because "as a practical matter" these entities hold the majority of the loans and are required to pursue collection. *See Tipton, supra,* 768 F.Supp. at 569–571. In light of the cases cited above, however, this is an insufficient basis upon which to bind those Guarantee Agencies who have paid default reinsurance claims to lenders and who have not received a subsidy from the Secretary.

**32.** Although Plaintiffs did not request further discovery by means of an affidavit as required by Fed.R.Civ.P. 56(f), the Court shall excuse this oversight as this Motion is not now one for summary judgment. Moreover, even if the Motion could be deemed one for summary judgment, the Court has wide flexibility in determining the appropriate course of action in the event a party does not adhere to the technical requirements of Fed.R.Civ.P. 56(f). Given that no discovery has commenced and given that Plaintiffs have raised a bona fide issue, the Court shall, in the interests of justice, permit limited discovery on the issues presented at 32–33 of Plaintiffs' Opposition.

*Treatise on the Law of Contracts, supra,* § 1763A, 226, n. 5 (jurisdictional clauses may, in certain circumstances, be unconscionable). To decide whether a choice-of-forum clause is unconscionable, the Court must look to the entire factual basis of the transaction. *See Williams v. Walker–Thomas Furniture Co., supra* (remanding for further development of record in order to determine whether clause was unconscionable). Therefore, the Court shall deny Crestar's Motion, without prejudice to renewal upon completion of limited discovery.

## V. PURSUANT TO FED.R.CIV.P. 12(B)(6), THE COURT SHALL DISMISS THE COMPLAINT AGAINST SALLIE MAE WITHOUT PREJUDICE

■ Defendant Student Loan Marketing Association ("Sallie Mae") has moved to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(1) on the grounds that the named Plaintiffs cannot assert a legally cognizable injury at the hands of Sallie Mae. Sallie Mae also moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiffs have failed to state a claim for relief with respect to Sallie Mae. The Plaintiffs contend that there are sufficient allegations in the Complaint to survive a motion to dismiss. Upon consideration of the claims presented herein, the Court shall dismiss the Complaint with respect to Sallie Mae, pursuant to Fed.R.Civ.P. 12(b)(6), without prejudice.

Defendant Sallie Mae argues that the Plaintiffs have failed to allege any wrongdoing on the part of Sallie Mae in any of the causes of action. Accordingly, Sallie Mae asks the Court to dismiss the case for failure to state a claim pursuant to Fed. R.Civ.P. 8 and 12(b)(6). *See* Sallie Mae's Memorandum at 4; Reply at 6. The Complaint does allege that Sallie Mae has received GSLs from Guaranty Agencies by way of an assignment, *see* Complaint at 31, ¶ 87, and that Sallie Mae now holds the loan of Plaintiff Pierce. Complaint at 31, ¶ 87. On this basis, Plaintiffs contend that, to the extent that they have stated a claim against another Defendant, they have stated a claim against Sallie Mae. Pl.Opp. at 98. The Plaintiffs' Complaint does not pass muster under Fed.R.Civ.P. 8 and 12.

In the Complaint, the Plaintiffs do not put Sallie Mae on notice of the particular charges against it. The relevant counts of the Complaint speak only in terms of lenders, Guaranty Agencies and the Secretary. In other words, no wrongdoing is alleged on the part of Sallie Mae by name. Moreover, the Plaintiffs have not stated a claim against Sallie Mae under their assignment or holder theory as a matter of law. Plaintiffs' bare allegation that Sallie Mae holds GSLs related to CSW does not state a claim. Plaintiffs do not allege that the particular loans allegedly held [33] by Sallie Mae suffer from any of the deficiencies identified in the Complaint such as failure to include a notice of defenses clause. Nor is there a basis from which the Court can infer that the loans allegedly held by Sallie Mae are infirm by virtue of an assignment. Plaintiffs do not allege that Sallie Mae received the GSLs from the named lender Defendants. Thus, any alleged wrongdoing of the bank defendants cannot be imputed to Sallie Mae on the face of the Complaint.

33. Sallie Mae has also moved to dismiss this holder-based claim pursuant to Rule 12(b)(1) for lack of standing. According to Sallie Mae, it no longer holds the loan of Plaintiff Pierce. *See* Sallie Mae's Memorandum at 3 (citing Declaration of Mr. Inglis at ¶ 3). Plaintiffs contend that further discovery could assist them in determining whether Sallie Mae does, in fact, have an interest in this loan or the loan of any other named Plaintiff. *See* Pl.Opp. at 97, n. 15. There has been no discovery on this issue. *See* Order, *Jackson v. Culinary School of Washington,* Civ. 91–782 (D.D.C., Dec. 19, 1991) (Defendants need not respond to Plaintiffs' request for interrogatories until decision is rendered on the instant Motions to Dismiss). Therefore, entry of judgment on this issue pursuant to either Fed.R.Civ.P. 12(b)(1) or Fed.R.Civ.P. 12(b)(6) would be inappropriate. *See Blackhawk Heating & Plumbing Co. v. Driver,* 433 F.2d 1137, 1144–45 (D.C.Cir.1970) (adequate opportunity for discovery needed before court may resolve 12(b)(6) motion to dismiss for lack of standing); *Prakash v. American Univ.,* 727 F.2d 1174, 1180 (D.C.Cir.1984) (court may not determine a 12(b)(1) motion for lack of jurisdiction until non-moving party has opportunity to develop facts relating to jurisdiction issue).

Given the allegations in the Complaint, Sallie Mae's alleged relationship with the Guaranty Agencies or putative status as a governmental entity are the only possible bases upon which the Court may infer Sallie Mae's connection with the GSL transactions.[34] However, these allegations cannot state a claim as a matter of law. Sallie Mae correctly notes, and Plaintiffs do not dispute, that Sallie Mae is not an assignee of the Guaranty Agencies as a matter of law. *See* Sallie Mae's Memorandum at 3 (citing 34 C.F.R. § 682.102(c)(4) (1990)).[35] Moreover, Sallie Mae correctly notes, and Plaintiffs do not dispute, that Sallie Mae is not a governmental entity as a matter of law. *See* 20 U.S.C. § 1087-2 (Sallie Mae is a "private corporation ... financed by private capital"). *See also* Sallie Mae's Memorandum at 2. In short, even if the Complaint sufficiently states a claim against the assignees of the named Guaranty Agencies or against the Secretary, Sallie Mae does not fit into either category as a matter of law. Merely naming a party as a Defendant and seeking a claim for relief does not suffice to put that party on notice of the charges against it. *See, e.g., Allied Steel v. Tractor Products, Inc. v. First Nat'l City Bank of New York,* 54 F.R.D. 256 (N.D.Ohio 1971). Accordingly, the Complaint against Sallie Mae shall be dismissed, without prejudice,[36] pursuant to Fed.R.Civ.P. 12(b)(6).

## VI. CONCLUSION

Upon consideration of the Defendants' respective Motions, the Plaintiffs' opposition thereto, the applicable law, and the record herein, the Court finds that the Plaintiffs have stated a cause of action against the Defendant Secretary of Education with regard to: (1) the alleged origination relationship between the lenders and the school; (2) D.C.Code § 28-3904; (3) D.C.Code § 28-3809(a)(3); and (4) an estoppel arising from the alleged agency relationship between the school and the Secretary. The Plaintiffs may proceed against the Defendant Guaranty Agencies and the Defendant lenders on the basis of D.C.Code § 28-3809(a)(3) and § 28-3904.

Upon consideration of the Defendants' Motions, the Plaintiffs' oppositions thereto, the applicable law, and the record herein, the Court shall dismiss, pursuant to Fed. R.Civ.P. 12(b)(6), the following claims against all Defendants: (1) claims asserting a private right of action pursuant to the Higher Education Act, as stated at ¶¶ 266(b), 271–273, 275–276 of the Complaint; (2) claims asserted pursuant to D.C.Code § 28-3808, as stated at ¶¶ 266(b) and 274 of the Complaint; (3) all claims asserted pursuant to D.C.Code § 28-3807, as stated at ¶ 266(g); (4) claims pursuant to D.C.Code § 28-3809(a)(1) and (a)(2), as stated at ¶¶ 266(b) and ¶ 274 of the Complaint; (5) all claims pursuant to D.C.Mun.Reg., tit. 16, § 1212, as stated at ¶¶ 266(b), 269(e), 269(f); (6) the claims asserted on the basis of "ultimate liability" at ¶ 267. The Court shall also dismiss the estoppel claims with respect to the actions of the Secretary himself and the actions of the Guaranty Agencies. The Plaintiffs' claims asserting a federal right of action pursuant to an origination relationship, as stated at ¶ 266(a) of the Complaint, shall be dismissed with respect to the Guaranty Agency and lender Defendants. Sallie Mae's Motion to Dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is granted and the

---

**34.** Sallie Mae's alleged status as a "potential assignee" of the putative class members does not confer standing to sue nor is it a sufficient basis upon which to state a claim. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 1925, n. 20, 48 L.Ed.2d 450 (1976) (citations omitted); *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 690 (E.D.Pa. 1973).

**35.** The Court is not required to assume the validity of legal conclusions advanced in the Complaint, even if those legal conclusions are inextricably linked with the factual allegations. *See*

5A, C. Wright & A. Miller, *Federal Practice & Procedure,* § 1357, 315–318 (1989 & Supp.1991).

**36.** "The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even though the court doubts that plaintiff will be able to overcome the defects in his initial pleading." 5A, C. Wright & A. Miller, *Federal Practice & Procedure,* § 1357, at 360–367.

Complaint as to Sallie Mae is dismissed, without prejudice. The Court shall issue an Order of even date herewith consistent with the foregoing Opinion.

## ORDER

Upon consideration of the Motions to Dismiss filed by the Defendant First National Bank of Toledo and Crestar Bank, (hereinafter, "the Defendant banks"), the Virginia State Higher Education Assistance Authority, the Ohio Student Loan Commission, the Higher Education Assistance Foundation, the Great Lakes Higher Education Corporation, the Nebraska Student Loan Program, and the Texas Guaranteed Student Loan Corporation, (collectively, "the Guaranty Agencies"), the Student Loan Marketing Association and the Secretary of Education, the Plaintiffs' opposition thereto, the applicable law, the contentions advanced at oral argument, and for the reasons articulated in this Court's Opinion of even date herewith, it is, by this Court, this 26 day of March, 1992,

ORDERED that the Defendants' Motions to Dismiss with respect to Plaintiffs' claims against the Defendant Secretary of Education are DENIED as to: (1) the alleged origination relationship between the lenders and the school; (2) D.C.Code § 28–3904; (3) D.C.Code § 28–3809(a)(3); and (4) an estoppel arising from the alleged agency relationship between the school and the Secretary; and it is

FURTHER ORDERED that the Defendants' Motions to Dismiss the Plaintiffs' claims against the Defendant Guaranty Agencies and the Defendant lenders on the basis of D.C.Code § 28–3809(a)(3) and § 28–3904 shall be, and hereby are, DENIED; and it is

FURTHER ORDERED that the following claims shall be dismissed against all Defendants pursuant to Fed.R.Civ.P. 12(b)(6): (1) claims asserting a private right of action pursuant to the Higher Education Act, as stated at ¶¶ 266(b), 271–273, 275–276 of the Complaint; (2) claims asserted pursuant to D.C.Code § 28–3808, as stated at ¶¶ 266(b) and 274 of the Complaint; (3) all claims asserted pursuant to D.C.Code § 28–3807, as stated at ¶ 266(g); (4) claims pursuant to D.C.Code § 28–3809(a)(1) and (a)(2), as stated at ¶¶ 266(b) and ¶ 274 of the Complaint; (5) all claims pursuant to D.C.Mun.Reg., tit. 16, § 1212, as stated at ¶¶ 266(b), 269(e), 269(f); (6) the claims asserted on the basis of "ultimate liability" at ¶ 267; and it is

FURTHER ORDERED that the Defendants' Motions to Dismiss the estoppel claims with respect to the actions of the Secretary himself and the actions of the Guaranty Agencies shall be, and hereby are, GRANTED, and these claims shall be, and hereby are, dismissed pursuant to Fed. R.Civ.P. 12(b)(6); and it is

FURTHER ORDERED that the Motions of the Guaranty Agencies and Lenders to Dismiss the Plaintiffs' claims asserting a federal right of action pursuant to an origination relationship, as stated at ¶ 266(a) of the Complaint, shall be, and hereby are, GRANTED, and these claims shall be, and hereby are, dismissed with respect to the Guaranty Agency and lender Defendants pursuant to Fed.R.Civ.P. 12(b)(6); and it is

FURTHER ORDERED that Sallie Mae's Motion to Dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) shall be, and hereby is, GRANTED and the Complaint as to Sallie Mae shall be, and hereby is, dismissed without prejudice; and it is

FURTHER ORDERED that, pursuant to Rule 16 of the Federal Rules of Civil Procedure, counsel for all parties shall appear before the Court on May 26, 1992 at 10:00 a.m. for a scheduling conference and shall be prepared to present to the Court at that time a plan for the early resolution of the above-captioned case, in accord with the mandate of Rule 1 of the Federal Rules of Civil Procedure, so that this matter may be concluded within ninety (90) days of this Order; and it is

FURTHER ORDERED that the parties shall complete any and all discovery on the remaining issues in the above-captioned case on or before 4:00 p.m. on April 17, 1992; and it is

FURTHER ORDERED that the parties shall file any and all dispositive Motions in the above-captioned case on or before April 30, 1992; and that any oppositions thereto shall be filed on or before 4:00 p.m. on May 11, 1992; and that any replies thereto shall be filed on or before 4:00 p.m. on May 20, 1992; and it is

FURTHER ORDERED that any further dispositive motions or pleadings in the above-ordered case shall not exceed 15 pages in length.